871 P.2d 801

**STATE of Idaho, Plaintiff–Respondent–Cross Appellant,**

v.

**Mitchel John ODIAGA, Defendant–Appellant–Cross Respondent.**

No. 19681.

Supreme Court of Idaho,
Boise, November 1993 Term.

Feb. 3, 1994.

Rehearing Denied April 28, 1994.

Brian E. Elkins, Ketchum, and Nevin, Ko-
foed & Herzfeld, Boise, for appellant. Brian
E. Elkins argued.

Larry EchoHawk, Atty. Gen. and Lynn E.
Thomas, Deputy Atty. Gen., Boise, for re-
spondent. Lynn E. Thomas argued.

McDEVITT, Chief Justice.

# I

## BACKGROUND AND PROCEDURE

The essential facts of this case are not in
dispute. At approximately 10:00 p.m., June
22, 1990, Mitchel John Odiaga ("Odiaga")
drove a white Oldsmobile into Ketchum, Ida-
ho. Odiaga then shot and killed Gerald
"Shenendoa" Wright ("Wright") and Bruce
Schafer ("Schafer"). The shootings occurred
within minutes of each other.

Odiaga proceeded to Warm Springs Road,
where he exited his car. Jerry Johnson
("Johnson") was driving down Warm Springs
Road, toward Odiaga. Odiaga brought his
rifle to bear on Johnson, who dove across the
front seat of his car. A bullet from Odiaga's
rifle entered the driver's-side window of the
car, passed over Johnson, and exited through
the passenger's side door.

After driving through two police road-
blocks, Odiaga drove his vehicle out of Ket-
chum, toward Galena Summit. Idaho State
Policeman Ross Kirtley followed Odiaga
north on Highway 75 toward Galena Summit.
Officer Kirtley soon found Odiaga's vehicle
overturned in the barrow pit alongside the
road. Odiaga was not in the vehicle.

At approximately 3:30 a.m., June 23, Odia-
ga approached Gary Perdue, a city marshall
from Stanley, at a roadblock on the highway.
Odiaga, carrying his rifle, approached Officer
Perdue and said "there's been a terrible acci-
dent." Officer Perdue took the rifle from
Odiaga, who did not resist, and placed him
under arrest.

Before entering a plea, Odiaga moved for a
hearing to determine his competency to
stand trial. The State did not contest the
contention that Odiaga was not competent
and, on September 13, 1990, the trial court
entered an order suspending the proceed-
ings. Odiaga was committed to the Director
of the Department of Corrections for care
and treatment at the Idaho Secure Medical
Facility. The court ordered that Dr. Estess,
a psychiatrist assigned to the State Board of
Corrections, function as a court-appointed
doctor, with the power to treat Odiaga. In a
letter dated December 14, 1990, Dr. Estess
informed the court that Odiaga was compe-
tent to stand trial. Odiaga entered a plea of
not guilty to all counts of the indictment.

Prior to trial, Odiaga moved the court to
order that, if Odiaga lacked the capacity to
appreciate his conduct or to conform his con-
duct with the requirements of the law, he
should be acquitted. Odiaga also moved for
a post-indictment preliminary hearing. The
Court denied both of Odiaga's motions.

The State then moved to compel a psychi-
atric evaluation of Odiaga. The State argued
that, because Odiaga was relying on psychi-
atric evaluations as a key part of his defense,
the State should be entitled to compel an
evaluation under Idaho Code § 18–211(5)(d).
The trial court granted the State's motion to

compel, ordering that Odiaga's attorneys could be present during the evaluation, the evaluation would be recorded, and the prosecutors would be prohibited from specifically inquiring into privileged information. If improper or inadmissible information was obtained, the court held that Odiaga could move to suppress it.

On February 28, 1991, Odiaga filed a motion to dismiss the charges against him or, in the alternative, to suppress statements made "to any state agent or evidence derived therefrom" on the grounds that the statements were elicited in violation of Odiaga's rights under the Fourth, Fifth, and Sixth Amendments to the United States Constitution. Odiaga argued that various law enforcement personnel denied him access to counsel, and improperly elicited several statements after he invoked his right to counsel. After hearing extensive evidence on this issue, the trial court suppressed the statements Odiaga made to arresting and interrogating officers.

On July 16, 1991, the defense filed a motion asking the court to direct the State to stop administering all antipsychotic and psychotropic medications to Odiaga. The defense reasoned that "the defendant's demeanor has probative value, and anti-psychotic medication artificially alters his demeanor, thus denying him a fair trial, due process, and the right to effectively be present at trial. . . ." The trial court reserved ruling on the matter, stating that the record indicated medication was necessary for the defendant to be competent to stand trial. Odiaga's attorney stated that Odiaga would waive his right to be competent at trial if the court granted the motion.

The court later denied the motion from the bench, reasoning that there was no proof of what would happen if Odiaga were to be taken off medication. The court found that, according to Dr. Estess, the only reason Odiaga was presently competent was because of the medication. The court also held that expert witnesses could adequately inform the jury what effect the medication was having on Odiaga's demeanor.

During the trial, the defense moved to exclude cross-examination and rebuttal re-garding Odiaga's prior acts of violence and illegal drug abuse. The court reserved ruling on the motion in limine, indicating that the issues raised on direct examination would determine the admissibility of the evidence. After Odiaga called and examined Dr. Estess, the State asked the court to rule that they could inquire into Odiaga's specific acts of violence and drug abuse. The court ruled that issues raised by the defense on direct examination justified admitting the evidence.

The jury returned a verdict finding Odiaga guilty of two counts of second degree murder, one count of attempted first degree murder, and two counts of aggravated assault. The jury found Odiaga not guilty of aggravated or simple assault on the count relating to Officer Perdue. The jury also found that Odiaga used a deadly weapon and/or firearm in the commission of each crime for which he was convicted.

At the sentencing hearing, the court heard testimony from Dr. Estess, Dr. Beaver, Odiaga's father, a statement from Odiaga, and considered a presentence investigation report. The court then sentenced Odiaga to concurrent minimum determinate life sentences for each second degree murder conviction; an enhanced determinate sentence of thirty years, fifteen years determinate, for the attempted first degree murder conviction, with an additional determinate fifteen year enhancement for use of a firearm or deadly weapon; and enhanced determinate sentences of fifteen years for both counts of aggravated assault, consisting of five years for each aggravated assault conviction and an additional determinate term of ten years for the use of a firearm or deadly weapon on each count. The court ordered that all sentences be served concurrently at the Idaho Maximum Security Institution, and authorized treatment during the period of confinement as prescribed by Dr. Estess or his successor. Odiaga appeals his conviction and sentence.

## II

### ISSUES ON APPEAL

A. Did the trial court err by denying Odiaga's motion to be taken off anti-

psychotic and psychotropic medications?

B. Does the absence of an insanity defense in Idaho violate the Idaho and United States Constitutions?

C. Did the trial court err by allowing the State to introduce evidence of Odiaga's prior bad acts?

D. Does a defendant who has been indicted by a grand jury have a right to a post-indictment preliminary hearing?

E. Was the State's violation of Odiaga's constitutional rights by questioning him after he invoked the right to counsel without first providing him with a public defender so "shocking" and "outrageous" as to warrant an acquittal?

F. Did the trial court err by allowing the State to conduct a psychiatric evaluation of Odiaga?

G. Was the trial court's sentence excessive?

## III

## ANALYSIS

**A. Did the trial court err by denying Odiaga's motion to be taken off antipsychotic and psychotropic medications?**

On May 18, 1992, six months after the trial court entered the judgment of conviction against Odiaga, the United States Supreme Court issued its opinion in *Riggins v. Nevada*, —— U.S. ——, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992). *Riggins* presented the precise issue this Court now faces: under what conditions can a trial court order that a criminal defendant be administered antipsychotic medication against his or her will?

We note at the outset that Odiaga did not challenge the trial court's ruling under the Idaho Constitution. Our analysis is therefore restricted to issues raised under the Sixth and Fourteenth Amendments to the

United States Constitution. *See State v. Raudebaugh*, 124 Idaho 758, 763, 864 P.2d 596, 601 (1993) (refusing to consider issue raised under Idaho Constitution when presented for first time in reply brief).

■ Under the United States Supreme Court's decision in *Riggins*, once Odiaga moved to terminate the administration of antipsychotic medication, "the State became obligated to establish the need for [the medication] and the medical appropriateness of the drug." *Riggins*, —— U.S. at ——, 112 S.Ct. at 1815. The burden rests with the prosecution to show that medication is medically appropriate, essential to protect some significant interest, such as Odiaga's safety or the safety of others, and that no less obtrusive means of protecting that interest exists. *Id.* In this case, the trial court erred by placing the burden on Odiaga to show what would happen if he were taken off antipsychotic medications. The record presents neither a finding of what would happen if the medication were terminated during trial nor any discussion of less obtrusive alternatives.

■ The trial court also based its holding on the argument that terminating Odiaga's medication could render him incompetent to stand trial. Although this issue was not directly presented to the United States Supreme Court in *Riggins*,[1] it is clear that the trial court similarly violated Odiaga's Sixth and Fourteenth Amendment rights by requiring that he come forward with a showing that he could remain competent without medication. The court improperly placed this burden on Odiaga, rather than requiring the State to prove that the medication was necessary for this purpose and that no less obtrusive alternative was available.

■ The United States Supreme Court's decision in *Riggins* was announced after the trial court entered judgment against Odiaga. However, the present case is presented to this Court on direct review, which requires

---

1. The Supreme Court referred to this issue, commenting that "the state might ... justify medically appropriate, involuntary treatment with the drug by establishing that it could not obtain an adjudication of Riggins' guilt or innocence by using less intrusive means." *Riggins*, —— U.S. at

—— , 112 S.Ct. at 1815. However, the Court did not rule on this issue, holding that "[t]he issue of whether a competent criminal defendant may refuse antipsychotic medication if cessation of medication would render him incompetent at trial is not before us."

that this Court give the federal constitutional issues decided in *Riggins* full retroactive effect. As the United States Supreme Court recently announced:

> When [the federal Supreme Court] applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and *must be given full retroactive effect in all cases still open on direct review* and as to all events, regardless of whether such events predate or postdate our announcement of the rule.

*Harper v. Virginia Dep't of Taxation,* — U.S. —, —, 113 S.Ct. 2510, 2517, 125 L.Ed.2d 74 (1993) (emphasis added).

The trial court's order denying Odiaga's motion to terminate treatment violated the Sixth and Fourteenth Amendments to the United States Constitution. We therefore reverse the judgment of conviction, and remand this case for a new trial. Because we order a new trial on appeal, this Court "shall pass upon and determine all questions of law involved in the case presented upon such appeal, and necessary to the final determination of the case." I.C. § 1-205; *Bott v. Idaho State Bldg. Auth.,* 122 Idaho 471, 479, 835 P.2d 1282, 1290 (1992).

## B. Does the absence of an insanity defense in Idaho violate the Idaho and United States Constitutions?

■ The validity of I.C. § 18-207, eliminating mental condition as a defense in criminal proceedings, is now established in Idaho case law. *See State v. Winn,* 121 Idaho 850, 854, 828 P.2d 879, 883 (1992) ("It is well established that the absence of an insanity defense ... does not violate any constitutional protections."); *State v. Card,* 121 Idaho 425, 429, 825 P.2d 1081, 1085 (1991) ("absence of the insanity defense ... does not violate any constitutional protections"), *cert. denied,* — U.S. —, 113 S.Ct. 321, 121 L.Ed.2d 241 (1992); *State v. Searcy,* 118 Idaho 632, 637, 798 P.2d 914, 919 (1990) ("due process ... does not constitutionally mandate an insanity defense"). Odiaga presents no new basis upon which to consider the constitutionality of I.C. § 18-207, but simply asserts that this Court should reconsider its prior rulings on the subject. Having previ-

ously decided this question, and being presented with no new basis upon which to consider the issue, we are guided by the principle of *stare decisis* to adhere to the law as expressed in our earlier opinions. *See Card,* 121 Idaho at 444, 825 P.2d at 1100 (McDevitt, J., specially concurring).

## C. Did the trial court err by allowing the State to introduce evidence of Odiaga's prior bad acts?

Idaho Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person.... It may, however, be admissible for other purposes." If relevant to another issue at trial, evidence of other bad acts must nonetheless be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." I.R.E. 403. The decision to admit evidence of prior crimes and bad acts requires balancing the importance of the purpose for which it is offered under I.R.E. 404(b) with the extent of its likely prejudicial effect under I.R.E. 403. This balancing "is a matter for the exercise of the sound discretion of the trial court." *State v. Smith,* 117 Idaho 891, 896, 792 P.2d 916, 921 (1990) (quoting *State v. Stuart,* 110 Idaho 163, 170, 715 P.2d 833, 840 (1985) (*affirmed on rehearing*)). Thus, our review of the trial court's ruling is limited to determining whether the court abused its discretion by admitting the evidence of Odiaga's prior bad acts.

Odiaga asserts that the court erred by admitting evidence of his prior marijuana and LSD use, threats of violence, and violent acts. However, Odiaga elicited the first testimony regarding acts and threats of violence during his direct examination of Dr. Estess, and did not object to the first reference to prior marijuana use. *See State v. Orr,* 123 Idaho 55, 56-57, 844 P.2d 684, 685-86 (1992) (this Court will not consider an issue not raised before the trial court).

■ The State moved the trial court to allow cross-examination into Odiaga's prior LSD use after Odiaga's direct examination of Dr. Estess. Although the trial court had

previously ruled that the State could not present evidence of Odiaga's prior bad acts, the court granted the State's motion, finding that Odiaga's direct examination provided a basis upon which the evidence was admissible. The court reasoned that the defense may have placed Odiaga's character at issue. If so, that was a sufficient justification by itself under I.R.E. 404. The court also found that the defense "opened the door" for admission of this evidence by selectively raising issues from Odiaga's past, dating back to his childhood. Also, experts called by the defense testified that this evidence was part of the basis for their opinions. Dr. Estess specifically stated that the evidence should be considered on the issue of intent, and that the evidence offered a reasonable alternative explanation for the events of June 22nd. The court also ruled that the evidence was proper impeachment of testimony elicited by the defense that Odiaga had a normal childhood and other defense witnesses' testimony regarding past acts of bizarre behavior. Finally, the court ruled that the evidence is relevant to determining whether Odiaga's intoxication was voluntary or involuntary, and rebuts the defense's contention that Odiaga was self-medicating with Sudafed at the time of the killings.

The trial court's focus on these issues properly balanced the issues of relevance and potential prejudice under I.R.E. 403. Even if this evidence were not properly admissible at the time the court originally granted Odiaga's motion in limine to exclude it, the extensive evidence the defense elicited during direct examination provided sufficient justification for the court's later ruling. *See State v. Enno,* 119 Idaho 392, 407, 807 P.2d 610, 625 (1991) (character evidence properly rebutted by State when offered and admitted by the defendant).

**D. Does a defendant who has been indicted by a grand jury have a right to a post-indictment preliminary hearing?**

Odiaga argues that he was denied due process because he was indicted by a grand jury instead of being accused through a preliminary hearing. There is no constitutional basis upon which to base this claim. The Idaho Constitution provides that "[n]o person shall be held to answer for any felony or criminal offense of any grade, unless on presentment or indictment of a grand jury or on information of the public prosecutor...." Idaho Const. art. I, § 8. No language in the Idaho Constitution indicates that the two accusatory proceedings are anything other than alternatives to one another.

In *State v. Edmonson,* 113 Idaho 230, 743 P.2d 459 (1987), this Court specifically held that "the prosecutor can use *either* a grand jury proceeding or a preliminary hearing before an impartial magistrate to initiate criminal proceedings." 113 Idaho at 232, 743 P.2d at 461 (emphasis added). The Court went on to conclude that "an indictment by a grand jury does not afford the accused a right to a preliminary hearing." *Id.* Indictment and information both afford criminal defendants all of the process that is due at the accusatory stage in the proceedings. The trial court did not err by denying Odiaga's motion for a post-indictment preliminary hearing.

**E. Was the State's violation of Odiaga's constitutional rights by questioning him after he invoked the right to counsel without first providing him with a public defender so "shocking" and "outrageous" as to warrant an acquittal?**

Odiaga was first given his *Miranda* rights immediately after his arrest at approximately 3:30 a.m., June 23, 1990. After asking to have his *Miranda* rights read to him again, Odiaga invoked his right to counsel. However, police officers repeatedly questioned Odiaga without providing an attorney. The public defender requested access to Odiaga from the morning of June 23rd until appointed by a magistrate to represent him on June 25th. Prior to this incident, all local police agencies were notified by letter that Mr. Elkins would be taking public defender appointments during June 1990. The letter also demanded, under I.C. § 19–853(a)(2), that Mr. Elkins be immediately notified if any suspect without his or her own attorney was detained for questioning.

Although the public defender was not appointed until June 25th, the trial court

correctly concluded that questioning between the time of Odiaga's arrest and that appointment was "custodial interrogation," implicating Odiaga's Fifth Amendment rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *See State v. Ybarra,* 102 Idaho 573, 576, 634 P.2d 435, 438 (1981) ("The test for determining whether questioning is custodial or merely investigative is whether the person is in custody or deprived of his freedom of action in any significant way."). Odiaga was promptly advised of his constitutional rights before and during this interrogation, and invoked his right to counsel by saying "I'd just as soon hire an attorney." The police extensively questioned Odiaga after he made this statement.

Based on these facts, Odiaga moved the trial court to suppress statements elicited after Odiaga invoked his right to counsel or, alternatively, to dismiss the charges against him. The court granted Odiaga's motion to suppress in substantial part. On appeal, Odiaga assigns error to the trial court's failure to suppress testimony about a telephone conversation between Odiaga and his cousin's wife while he was in custody and the fact that it did not dismiss the prosecution against him.

■ Odiaga did not include testimony about the telephone conversation in his motion to suppress, presented no argument on the issue at trial, and did not object to any portion of the court's order granting the motion to suppress. Odiaga's sole objection to this testimony at trial was that the State did not provide sufficient notice that the witness would be called for rebuttal. Evidence before the trial court indicated that the State received the information shortly before it was offered, and that the defense had interviewed this witness and was aware of the statements more than a year before they were offered. Both at trial and on appeal, Odiaga states no prejudice from the late disclosure of the information. The proper test in this situation is to determine "whether lateness of disclosure so prejudiced defendant's preparation or presentation of his defense that he was prevented from receiving his constitutionally guaranteed fair trial."

*State v. Pizzuto,* 119 Idaho 742, 751, 810 P.2d 680, 689 (1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1268, 117 L.Ed.2d 495 (1992). In this case, although the State's disclosure was late in the proceedings, the record indicates that the defense was aware of this witness and her potential testimony for more than a year before the testimony was offered. Even if the State's behavior had violated the duty to disclose, the trial court's refusal to exclude the evidence is not reversible error absent a showing of prejudice. *State v. Marek,* 112 Idaho 860, 868, 736 P.2d 1314, 1322 (1987).

The question of whether this testimony resulted from the State's withholding Odiaga's access to counsel, after repeated requests from both Odiaga and Mr. Elkins, was not presented to the trial court and is not properly resolved here. If that issue is presented during the new trial ordered in this case, it will be a matter for the trial court to determine at that time.

Alternatively, Odiaga relies on dictum from *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), as a basis for dismissing the charges. That opinion states:

> We may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.

411 U.S. at 431–32, 93 S.Ct. at 1642–43. While the State's actions were constitutionally defective, the court suppressed all testimony derived through those actions. The only prejudice Odiaga can plausibly argue at this point is from the admission of testimony about the telephone conversation, which was not included in this motion to suppress. If that issue is presented to the trial court, it would then be proper to consider the evidence and its relation to the motion to suppress or dismiss. At this juncture, there is no basis upon which Odiaga can allege significant prejudice which was not properly cured by the trial court's order suppressing the State's evidence.

**F. Did the trial court err by allowing the State to conduct a psychiatric evaluation of Odiaga?**

The Fifth Amendment to the United States Constitution and article I, section 13 of the Idaho Constitution prohibit compelling a criminal defendant to be a witness against himself or herself. Following Idaho's repeal of the insanity defense, no statutory scheme remains through which a psychological evaluation can be compelled without threatening the rights guaranteed under both of those constitutions.

■ This procedure also directly implicates the psychotherapist-patient privilege provided under I.R.E. 503. That rule provides that, in criminal proceedings, the patient may "refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of diagnosis or treatment of the patient's mental or emotional condition...." I.R.E. 503(b)(2). Although I.R.E. 503(d)(3) states that "[t]here is no privilege under this rule as to a communication relevant to an issue of the ... mental or emotional condition of the patient in any proceeding in which he relies upon the condition as an element of his claim or defense[,]" in the wake of Idaho's repeal of the insanity defense, mental defect is no longer an assertable defense. This rule, and pre-repeal case law recognizing the State's right to compel a psychological evaluation of a defendant who pleads the defense of insanity, no longer apply. As a result, we conclude that the trial court erred by allowing the State to compel Odiaga to submit to a psychological evaluation. *See* I.C. § 18–207(a) ("Mental condition shall not be a defense to any charge of criminal conduct.").

The State urges that the trial court had "inherent authority" to compel a psychiatric evaluation, and analogizes the situation to medical examination in civil suits. However, this view ignores the plain language of I.R.E. 503, which allows such examinations when they pertain to an element of a claim or defense put in issue by the patient. This analysis also ignores the unique constitutional difficulties posed when a criminal defendant is compelled to submit to an examination.

**G. Was the trial court's sentence excessive?**

■ This Court's task when reviewing the reasonableness of the sentence imposed below is to determine whether the trial court abused its discretion. *State v. Charboneau*, 124 Idaho 497, 499, 861 P.2d 67, 69 (1993) (quoting *State v. Broadhead*, 120 Idaho 141, 143, 814 P.2d 401, 403 (1991)). The record clearly shows that the trial court properly applied I.C. § 19–2520, the criteria for placing the defendant on probation or imposing imprisonment, and the four objectives of criminal punishment stated by this Court in *State v. Wolfe*, 99 Idaho 382, 582 P.2d 728 (1978).[2] The question presented in this case is whether the trial court exercised its discretion consistently with the legal standards for considering mental capacity at sentencing set out by I.C. § 19–2523(1).

Idaho Code § 19–2523, which requires that the trial court consider the defendant's mental illness as a sentencing factor, was an integral part of the legislature's repeal of mental condition as a defense. *See* S.L.1982, ch. 368 § 2 (abolishing mental condition as a defense); S.L.1982, ch. 368 § 10 (requiring consideration of mental condition at sentencing). That statute requires that, if the defendant's mental condition is a significant issue, the sentencing judge must consider such factors as:

(a) The extent to which the defendant is mentally ill;

(b) The degree of illness or defect and level of functional impairment;

(c) The prognosis for improvement or rehabilitation;

(d) The availability of treatment and level of care required;

**2.** The factors to be considered in sentencing which this Court listed in *Wolfe* are: (1) protection of society; (2) deterrence of the individual and the public generally; (3) the possibility of rehabilitation; and (4) punishment or retribution. *Wolfe*, 99 Idaho at 384, 582 P.2d at 730; *see also State v. Broadhead*, 120 Idaho 141, 146, 814 P.2d 401, 406 (1991).

(e) Any risk of danger which the defendant may create for the public, if at large, or the absence of such risk;

(f) The capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law at the time of the offense charged.

I.C. § 19–2523(1).

The trial court properly considered the first five factors, noting that Odiaga is seriously mentally ill under (a) and (b); that the prognosis for rehabilitation under (c) is limited to some relief from the symptoms of the psychosis, with no cure likely; that the appropriate treatment in (d) is available at the secure facility; and that Odiaga is potentially dangerous if he stops taking his medication, creating a potential risk to the public that should be considered under (e). With regard to Odiaga's capacity to appreciate and conform his conduct, the court found that, although all of the medical experts testified that Odiaga was not capable of conforming his conduct to the requirements of the law, the jury found to the contrary, and the court agreed with the jury's conclusion. Because Odiaga's capacity was not an issue presented to the jury, the trial court applied an incorrect legal standard to the choices available to it.

The trial court apparently concluded that the jury's finding that Odiaga possessed the intent necessary to commit murder involved the same inquiry into capacity required at sentencing by I.C. § 19–2523(1). See I.C. § 18–4001 ("Murder is the unlawful killing of a human being with malice aforethought. . . ."). The jury's finding that Odiaga possessed the intent necessary to commit murder was not the finding as to the degree of his capacity to appreciate and conform his conduct required by I.C. § 19–2523.

Before any defendant can be sentenced, that person must be found guilty beyond a reasonable doubt of every element of the offense with which he or she is charged, including the intent to commit the offense. See I.C. §§ 18–114 ("In every crime or public offense there must exist a union, or joint operation, of act and intent, or criminal negligence."); 18–115 ("The intent or intention is

manifested by the circumstances connected with the offense, and the sound mind and discretion of the accused."). By requiring the court to consider the defendant's capacity at sentencing, the legislature necessarily required that the court consider the defendant's capacity to appreciate his or her actions separately from the ability to form the requisite intent to commit the offense. The trial court therefore erred by incorrectly applying the legal standard for determining intent to the issue of the Odiaga's capacity to appreciate and conform his conduct.

## IV

## CONCLUSION

For the reasons stated above, we reverse the conviction and remand the case for a new trial consistent with this opinion.

BISTLINE, JOHNSON, TROUT and SILAK, JJ., concur.