HORTON, Justice.
Ethan Windom appeals the district court’s imposition of a determinate life sentence for the second-degree murder of his mother. We affirm.
I. FACTUAL AND PROCEDURAL BACKGROUND
Ethan Windom (Windom) lived alone with his divorced mother, Judith Windom (Judith). In late 2006, sixteen-year old Windom was diagnosed as suffering from anxiety and a major depressive disorder with no psychotic features. He was prescribed medications appropriate to those conditions. His counselor expressed concern that Windom may be a psychopath, and noted that if so, his condition was not treatable.
Windom was fascinated by serial killers, psychopaths, and schizophrenics. Beginning in the eighth grade, he modeled aspects of his daily life upon the habits of the protagonist in the movie American Psycho, carrying a briefcase to school, maintaining a specific hygiene routine, and using particular brands of hygiene products and luggage. He kept a day planner within which he wrote about “killing] everyone” and “see[ing] how” human organs would taste. The day planner contained sketched figures of naked women being tortured and killed in gruesome ways.
Windom had an aggressive relationship with his mother. He bullied her into buying him the expensive personal hygiene products and accessories he knew from American Psycho, and intimidated her into occupying their home’s smallest bedroom. He dominated the remaining spaces in the home. He repeatedly told his friends that he wanted his mother dead. Windom’s father, Judith’s ex-husband, testified that on more than one occasion, she had expressed fear that Windom would kill her as she slept.
On the evening of January 24, 2007, Windom experienced a strong urge to kill. He took five times his normal dose of anti-anxiety medication. He considered seeking out “bums” to kill, but feared that his mother would stop him. Instead, Windom fashioned a club by attaching several weights to the end of a dumbbell. He collected two knives and took the club to Judith’s bedroom. Windom placed his hand over his mother’s mouth while she slept and began to beat her in the face with the club. When his arms tired from the weight, he took one of the knives and stabbed her repeatedly in the throat, chest, and abdomen. Eventually convinced that Judith was dead, Windom removed his hand from what he “thought was her mouth” and thrust the second knife into her exposed brain.
*875 Windom then changed the home’s answering machine message to relate that he and his mother had unexpectedly left town to deal with family issues. He called a friend and left her a voicemail stating that he would not meet her as was their normal morning routine. He then attempted to hitchhike to his father’s house and eventually walked there. Upon arriving, Windom told his father that someone had attacked Judith and that she was dead. After Windom’s father called the police, Windom was arrested and interrogated. Later that day, he confessed to the murder. He was charged as an adult with first-degree murder, eventually pleading guilty to an amended charge of second-degree murder.
'While he was incarcerated, two mental health professionals assessed Windom. The first, Dr. Craig Beaver, a licensed psychologist, tentatively diagnosed him as suffering from schizophrenia, paranoid type. Dr. Beaver observed that Windom’s symptoms appeared to be in partial remission as he was stabilized by the antipsychotic medication administered during his incarceration. Dr. Beaver opined that the murder occurred during a psychotic break. He noted that research demonstrates that individuals with similar psychiatric illnesses change and modify as they age, and their risk for future violence diminishes “precipitously” after they turn thirty. Dr. Beaver expressed concern that Windom would present a threat of violent behavior if he were to stop regularly taking medication.
The second mental health professional, Dr. Michael Estess, is a psychiatrist. He first met Windom a few days after his arrest. At that time, Dr. Estess viewed Windom as “acutely psychotic.” Dr. Estess viewed Windom as suffering from “an evolving paranoid, psychotic, delusional illness.” Dr. Estess opined that the murder was “entirely a product of [Windom’s] inappropriate, disorganized, illogical and psychotic process that was evolving above and beyond his control.” Dr. Estess viewed Windom as having been “perfectly compliant” with all of his treatment recommendations. Finally, Dr. Estess opined that Windom was a “good candidate for treatment, both inpatient and outpatient” and expressed his belief that Windom “would be compliant with treatment recommendation” regardless of whether he were incarcerated.
The district court imposed a determinate life sentence, the maximum sentence permissible for second-degree murder. After the Idaho Court of Appeals affirmed the sentence, this Court granted Windom’s petition for review.
II. STANDARD OF REVIEW
Upon granting a petition for review of a Court of Appeals’ decision, this Court gives serious consideration to the views of the Court of Appeals, but directly reviews the decision of the trial court. Humberger v. Humberger, 134 Idaho 39, 41, 995 P.2d 809, 811 (2000). Where the sentence imposed by a trial court is within statutory limits, “the appellant bears the burden of demonstrating that it is a clear abuse of discretion.” State v. Stevens, 146 Idaho 139, 148, 191 P.3d 217, 226 (2008). When evaluating a claim that the trial court has abused its discretion, the sequence of our inquiry is first, whether the trial court correctly perceived the issue as one of discretion; second, whether the trial court acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and finally, whether the trial court reached its decision by an exercise of reason. Sun Valley Shopping Ctr., Inc. v. Idaho Power Co., 119 Idaho 87, 94, 803 P.2d 993, 1000 (1991).
In order to prevail on a claim that a sentence represents an abuse of discretion, “the defendant must show in light of the governing criteria, [that the] sentence was excessive under any reasonable view of the facts.” State v. Charboneau (Charboneau II), 124 Idaho 497, 499, 861 P.2d 67, 69 (1993) (quoting State v. Broadhead, 120 Idaho 141, 145, 814 P.2d 401, 405 (1991), overruled on other grounds by State v. Brown, 121 Idaho 385, 825 P.2d 482 (1992)). Thus, where reasonable minds might differ, the discretion vested in the trial court will be respected, and this Court will not supplant the views of the trial court with its own. Broadhead, 120 Idaho at 145, 814 P.2d at 405. Thus, in order *876 to prevail, the appellant must establish that, under any reasonable view of the facts, the sentence was excessive considering the objectives of criminal punishment: (1) protection of society; (2) deterrence of the individual and the public generally; (3) the possibility of rehabilitation; and (4) punishment or retribution for wrongdoing. State v. Stover, 140 Idaho 927, 933, 104 P.3d 969, 975 (2005).
III. ANALYSIS
Although Windom’s appeal has been framed as a claim that the district court abused its discretion by imposing a fixed life sentence, careful review of his claim reveals that there is a second distinct issue relating to the legal standard governing imposition of fixed life sentences, specifically, whether a determinate life sentence may be imposed based solely upon the nature of the offense. As part of his argument that the sentence was an abuse of discretion, Windom asserts that the district court’s sentence reflected an improper “judicial hedge against uncertainty.” We address the question of whether a determinate life sentence may be imposed solely because of the egregiousness of the crime before turning our attention to the claim that the sentence was an impermissible hedge against uncertainty and the broader question of whether Windom’s sentence represented an abuse of the district court’s discretion.
A. The district court may impose a determinate life sentence based solely upon the nature and gravity of the offense.
On review, Windom suggests that this Court has not held, expressly or impliedly, that the nature of the offense standing alone, can support a determinate life sentence. We disagree. This Court has stated: “To impose a fixed life sentence ‘requires a high degree of certainty that the perpetrator could never be safely released back into society or that the nature of the offense requires that the individual spend the rest of his life behind bars’ ” Stevens, 146 Idaho at 149, 191 P.3d at 227 (emphasis added) (quoting State v. Cross, 132 Idaho 667, 672, 978 P.2d 227, 232 (1999)).
In State v. Jackson, 130 Idaho 293, 294, 939 P.2d 1372, 1373 (1997), this Court quoted the following language from the Idaho Court of Appeals with approval: “a fixed life sentence may be deemed reasonable if the offense is so egregious that it demands an exceptionally severe measure of retribution and deterrence____” Id. at 294, 939 P.2d at 1373 (quoting State v. Eubank, 114 Idaho 635, 638, 759 P.2d 926, 929 (Ct.App.1988)).
In State v. Cannady, 137 Idaho 67, 73, 44 P.3d 1122, 1128 (2002), Justice Eismann wrote: “When reviewing a fixed life sentence, the primary factors considered are the gravity of the offense and/or the need to protect society from the defendant.” In support of this statement, he cited to our earlier decision in State v. Enno, 119 Idaho 392, 807 P.2d 610 (1991). This is significant because of the following statement in Enno:
Although the sentence is a fixed life sentence with no possibility of parole, we find no abuse in the trial court’s decision. Considering the heinous and cruel nature of the crime and that capital punishment was available to the trial court as an alternative based on the aggravating circumstances that were found, the trial court’s decision is reasonable and within the maximum statutory limits allowed. Therefore, we affirm.
Id. at 409, 807 P.2d at 627. Today we reiterate that, in appropriate cases, a district court may impose a determinate life sentence based upon the egregiousness of the crime.
B. The district court did not abuse its discretion by sentencing Windom to serve a determinate life sentence.
As a prelude to its lengthy sentencing remarks, the district court explicitly noted that it was exercising its sentencing discretion, stating:
I have considered the nature of the offense. I have considered the mental health issues. I have considered mitigating and aggravating factors. I have considered in mitigation, for example, the relative youth. I have considered the fact that he does not have a long criminal record. And I have to say it is the most difficult case I have ever had. Ever. It *877 will haunt me forever. Not just the pictures of the crime scene and what you did to your mom, but the entirety of the case.
It is particularly difficult in this case because, as [the prosecutor] pointed out, I am presented with four different mental health diagnoses in the presentence report, or four different mental health professionals who have had contact with Mr. Windom at various times who have come to either a different diagnosis or a different prognosis.
The court then conducted an extended examination of the evidence relating to Windom’s mental health including the differing diagnoses reached by the mental health professionals who worked with Windom prior to the murder and those who saw him later, the circumstances of the murder and Windom’s behavior following the crime, including the manner in which he conducted himself during the interviews with law enforcement officers and the content of his statements to investigating officers. The district court concluded:
I don’t know which mental health professional has it right. But I tend to agree with [the prosecutor], assuming that Dr. Beaver and Dr. Estess are correct and Mr. Windom is a paranoid schizophrenic, as Dr. Beaver indicated, the safety of society requires a couple [of] things. If Mr. Windom is let out, the safety of society, according to Dr. Beaver, requires that first he be treated by a mental health professional who really has it right and we can have no assurances of that. The second thing is that he actually takes his medications and that they actually work and that he doesn’t play with his medications. And I don’t know that I’m willing to trust that.
My primary concern in a sentencing like this is protection of society. Mental health professionals cannot guarantee that Ethan Windom will be compliant or his medications will work or that he will be under proper treatment. We know in jail he has continued to titrate his medications. We know that he was not compliant before he entered incarceration. We know that he is still isolated from others. We know that he has continued on occasion to have bad thoughts even while in jail. We know that the only reason — we know that he is compliant because his medications are being injected. I cannot gamble that Ethan Windom will be compliant or that he will receive the proper care or that the medications will continue to work against some potential victim. Society deserves better than that.
Fixed life is — it is one of the harshest sentences that we can hand down and it’s reserved only for those offenses that are so egregious that it demands an exceptionally high measure of retribution, or that the evidence indicates that the offender cannot successfully be monitored in society to reduce the risk to those who come in contact with him and that imprisonment until death is the only way to insure that we are protecting society. In my view that is the ease here.
... [This murder] is so brutal and so heinous that I believe that a fixed life sentence is appropriate. I do not do that lightly. I have only on one other occasion given fixed life and it was for these similar reasons.
From these comments, it is evident that the district court was conscious of our earlier decisions holding that a fixed life sentence may be appropriate both when there is a high degree of certainty that the defendant can never be released safely into society and when the nature of the offense warrants such punishment. It is equally evident that the district court believed that both circumstances existed in this case. Windom asserts that the sentence imposed by the district court was an impermissible “judicial hedge against uncertainty” and argues that the district court abused its discretion, noting his expressed remorse for his crime, his youth, his rehabilitative potential and the evidence that his mental illness resulted in the murder. The State responds that the trial court properly considered each of the sentencing factors and reasonable minds may differ as to its conclusion that a determinate life sentence was warranted. Thus, the State concludes that the sentence cannot be deemed to represent an abuse of discretion.
1. The sentence imposed by the district court did not represent an impermissible judicial hedge against uncertainty.
This Court has recognized the effect of a determinate life sentence: “Absent an exeeu *878 tive commutation (an event which the judiciary can neither predict nor assume), a defendant given a fixed life sentence will be imprisoned until he [or she] dies.” Eubank, 114 Idaho at 637, 759 P.2d at 928. Thus, after receiving such a sentence, the defendant will never have the opportunity to demonstrate good behavior, successful rehabilitation or other mitigating factors that may persuade the parole commission that the defendant may be safely released into the community. These considerations led this Court to employ a standard unique to fixed life sentences and, in so doing, we adopted the Court of Appeals’ statement that “a fixed life sentence should not be regarded as a judicial hedge against uncertainty. To the contrary, a fixed life term ... should be regarded as a sentence requiring a high degree of certainty — certainty that the nature of the crime demands incarceration until the perpetrator dies in prison, or certainty that the perpetrator never, at any time in his life, could be safely released.” Jackson, 130 Idaho at 294-95, 939 P.2d at 1373-74 (quoting Eubank, 114 Idaho at 638, 759 P.2d at 929). Focusing on this language, Windom and the dissent argue that the district court’s sentencing comments demonstrate that the sentence imposed reflects this impermissible “judicial hedge against uncertainty.”
In Jackson, 130 Idaho at 294, 939 P.2d at 1373, this Court quoted a portion of the following statement from Eubank regarding the certainty required before imposing a fixed life sentence:
Unfortunately, in making these determinations, a judge has complete information only in regard to retribution and deterrence, which are based on the nature of the offense. The character of the offender is not completely known because it may evolve over time. The judge must attempt to predict the defendant’s future response to rehabilitative programs and the degree of risk he might pose to society if eventually released.
114 Idaho at 638, 759 P.2d at 929.
In this case, although the trial court had evidence before it including the opinions of two well-regarded mental health professionals regarding Windom’s rehabilitative potential, it was the judge who bore the heavy burden of evaluating whether Windom would actually comply with rehabilitative programming and whether such programming would reduce his risk of future violent behavior to an acceptable level.[1] Although Windom and the dissent rely heavily on these opinions, the trial court engaged in a lengthy discussion of other evidence casting doubt that Windom possessed the rehabilitative potential reflected in the opinions advanced by Drs. Beaver and Estess.
The district court’s comments reflect that it was not wholly persuaded of the accuracy of their shared diagnosis of schizophrenia, paranoid type. The trial court discussed the differing diagnoses of Windom’s earlier treating mental health professionals and the “tentative” diagnosis advanced by Dr. Beaver.
When considering the opinions that Windom’s crime was the product of a psychotic break, the trial court considered the differing diagnoses of Windom’s earlier treating mental health professionals as well as the evidence that Windom had planned and looked forward to the murder of his mother. For months preceding the murder, he had intimidated and bullied her, forcing her to move into the smallest bedroom while he dominated the other spaces in their home. He drew in his day planner graphic images of tortured women. He told friends and even his brother that he despised his mother and that he wanted her dead. Windom was so brazen that even his mother — his eventual victim— told Windom’s father that she feared he might kill her while she slept. The trial court cited evidence suggesting that Windom had studied the symptoms of mental illness and believed he could use them as a guise if he was ever in trouble with the law. During his interviews with police, he mentioned that he had researched the symptoms of schizophrenia, and when pressed by an officer *879 about whether “another part of Ethan” killed his mother, he laughingly replied that “MPD, multiple personality disorder, don’t work.” Additionally, it appeared that Windom modeled some of his conduct prior to and after the murder in the likeness of the serial-killer protagonist from a movie called American Psycho. Based upon the district court’s sentencing comments, it is evident that the court did not reject the possibility that Windom believed that he could mimic the brutal murders committed by the American Psycho protagonist and evade punishment by simulating a mental illness. The court also noted that Windom’s logic, responsiveness, and demeanor during the several interviews in the hours following the murder were suggestive that Windom may not have been actively psychotic.
The trial court further noted that even if Windom did suffer from a treatable mental health condition, both expert opinion and the course of Windom’s treatment indicated that the condition of his illness and his treatment regime would require meticulous oversight. During incarceration, Windom’s medication regime required titration, or monitoring of its efficacy and appropriate adjustment, several times. The Court noted evidence in the record that Windom was resistant to recommendations of Dr. Estess and others that he integrate with other juveniles and “go out into the yard and exercise” so that they could evaluate his behavior. The district court observed that before the murder, Windom had abused medications prescribed to treat his mental health by adjusting dosages and combining them with other substances. Although defense counsel pointed out that Windom had been compliant with his pharmacological regime while incarcerated, the court did not consider this to be a strong indication of his future compliance with the requirements imposed by mental health professionals. Rather, the district court pointed out that Windom’s compliance was merely the passive receipt of medication by way of injection.
The task of sentencing is a difficult one. When evaluating the defendant’s prospects for rehabilitation, trial judges are asked to make a probabilistic determination of a human being’s likely future behavior. The reality is that a sentencing judge will never possess sufficient information about the defendant’s character, life circumstances and past behavior so as to project future behavior with unerring accuracy. To the contrary, the factual determination of the defendant’s probability of re-offense will always be based upon limited data. This extraordinarily difficult task is made more difficult because it is merely one factor to be considered by the sentencing judge — and a subordinate consideration at that. State v. Moore, 78 Idaho 359, 363, 304 P.2d 1101, 1103 (1956) (“Rehabilitation is not the controlling consideration____The primary consideration is, and presumptively always will be, the good order and protection of society.”).
Sentencing is less a science than an art. Judges face a different uncertainty principle than physicists: they must make a factual finding of the probability of future criminal behavior based upon limited data. In so doing, they draw upon their accumulated experience. It is precisely because of the difficulty of fashioning an objectively appropriate sentence that this Court has adopted a deferential standard of review of sentencing decisions. In this case, Windom essentially asks this Court to re-weigh the evidence presented to the district court and reach a different conclusion as to his prospects for rehabilitation. It is evident that the district court did not believe that it was appropriate to abdicate its responsibility to conduct its own assessment of Windom’s mental condition based upon the evidence before it and to accept, without reservation, the opinions of two doctors who offered promises of Windom’s complete rehabilitation. If we were acting as sentencing judges, we may well have done as the dissent suggests, and placed greater weight on the opinions of Dr. Beaver and Estess than did the district court. However, our role is not to reweigh the evidence considered by the district court; our role is to determine whether reasonable minds could reach the same conclusion as did the district court. Applying this standard, we can find no error in the district court’s *880 finding that Windom represented an unreasonable risk of future dangerous behavior.[2]
2. In view of the nature of the offense, we can find no error in the district court’s conclusion that the nature of the offense warranted a determinate life sentence.
As discussed in Part 111(A) of this opinion, we continue to adhere to our earlier statements that the nature and gravity of the underlying offense may, standing alone, be sufficient to justify a determinate life sentence. The language from Eubank adopted by this Court in Jackson, 130 Idaho at 294, 939 P.2d at 1373, makes clear an important point: The considerations of societal retribution and general deterrence are not decided on the basis of the unique characteristics of the offender; rather these considerations are decided upon the characteristics of the offense.[3] See Eubank, 114 Idaho at 638, 759 P.2d at 929 (“a judge has complete information only in regard to retribution and deterrence, which are based on the nature of the offense.”). In contrast, considerations of the defendant’s prospects for rehabilitation, the correlated consideration of societal protection and specific deterrence are to be determined by the characteristics of the offender. In this case, the trial court discussed the brutality of the murder when it considered the egregiousness of the offense. Windom viciously beat his sleeping mother in the head with the club that he had fashioned for that purpose, until he no longer could determine whether his hand covered her mouth. Responding officers found Judith’s face to be unrecognizable. Windom then stabbed his mother repeatedly, deliberately attempting to stab her in the heart and the lungs before slitting her throat. He then deliberately left a knife in her exposed brain. The ferocity of the attack was such that only one of Judith’s arms could be exposed for viewing at her funeral. The circumstances of this offense are such that we cannot find that the district court erred in its conclusion that Windom’s offense was “so brutal and so heinous” as to warrant a fixed life sentence.
3. Windom has failed to show that the district court abused its discretion by imposing a fixed life sentence.
The preceding discussion may suggest that the district court’s sentence was purely the product of considerations of Windom’s prospects for rehabilitation and the nature of the crime he committed. This is not the ease. Rather, the structure of this opinion reflects the issues presented on appeal and the reasoning advanced by the dissent. In our view, the district court’s sentencing comments reflect: (1) an understanding of the discretionary decision before it; (2) recognition of the boundaries of its discretion; (3) recognition and application of the governing legal standards; and (4) the reasoning by which the district court reached its decision. As indicated in our statement of the standard of review, we examine the discretionary actions of a trial court in order to determine whether these requirements have been satisfied.
Windom claims that the district court abused its discretion by applying an erroneous legal standard. For the reasons set forth in Parts 111(A) and 111(B)(1), supra, we find this claim to be without merit. Distilled to its essence, the dissent believes that the trial court should have placed greater *881 weight upon Windom’s age, mental health issues and other mitigating factors. Our standard of review does not require (nor indeed, does it permit) us to conduct our own evaluation of the weight to be given each of the sentencing considerations (societal protection, general and specific deterrence, defendant’s prospects for rehabilitation and societal retribution) in order to determine whether we agree with the district court’s conclusion. Although reasonable minds may differ as to the “rightness” of the district court's factual conclusions as to Windom’s prospects for rehabilitation and whether the nature of his crime warrants fixed life imprisonment, it is manifest that the district court’s sentence was the product of reason.
In short, our task is not to determine whether we agree with the sentence imposed; rather, our duty is to determine whether Windom has demonstrated that the district court’s imposition of sentence constituted an abuse of its discretion under the well-established standards of review governing such decisions. We conclude that Windom has failed to do so.
IV. CONCLUSION
We affirm the district court’s judgment of conviction imposing a determinate life sentence for murder in the second-degree.
Chief Justice EISMANN and Justices BURDICK and J. JONES concur.

. We do not share the dissent’s view that the potential future action of parole authorities ought to be considered in the analysis of the propriety of a fixed life sentence imposed in the exercise of judicial discretion. The Legislature has conferred the power and responsibility to impose determinate sentences upon the judiciary, including determinate life sentences.

. The dissent relies heavily upon Graham v. Florida, — U.S.-, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010) and Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) in support of the conclusion that the district court abused its discretion. We believe this reliance to be misplaced inasmuch as both decisions rested upon the Eighth Amendment. Indeed, when considering the sentence imposed upon a defendant who was under 18 at the time of his crime, Graham expressly recognized that ''[t]here is a line 'between homicide and other serious violent offenses against the individual.’ ” - U.S. at -, 130 S.Ct. at 2027, 176 L.Ed.2d at 842 (quoting Kennedy v. Louisiana, 554 U.S. 407, 438, 128 S.Ct. 2641, 2660, 171 L.Ed.2d 525, 550 (2008)). In view of this clear line of demarcation, it is neither necessary nor appropriate to confuse our well-established standard of review of a trial court’s sentencing decision by selective application of statements found in decisions defining the scope of Eighth Amendment protections.

. For the reasons set forth in footnote 2, supra, we find the dissent’s reliance upon cases considering Eighth Amendment issues in the context of capital litigation to be misplaced.