**IN THE SUPREME COURT OF THE STATE OF IDAHO**

**Docket No. 39467-2011**

STATE OF IDAHO,          )
                                   )     **Boise, November 2013 Term**

     Plaintiff-Respondent,    )

                                   )     **2013 Opinion No. 111**

v.                           )

                                   )     **Filed: November 26, 2013**

TODD W. CARVER,       )

                                   )     **Stephen W. Kenyon, Clerk**

     Defendant-Appellant.    )

                                   )

Appeal from the District Court of the Second Judicial District of the State of Idaho, in and for Idaho County.  The Hon. Michael J. Griffin, District Judge.

The judgment of the district court is <u>affirmed</u>.

Spencer J. Hahn, Deputy State Appellate Public Defender, Boise, argued for appellant.

Jessica M. Lorello, Deputy Attorney General, Boise, argued for respondent.

_____

EISMANN, Justice.

This is an appeal out of Idaho County from a jury verdict of guilty to and the sentence for the crime of first degree murder of a three-year-old child.  The defendant challenges the failure of the district court to appoint him substitute counsel, the jury instructions defining felony murder, and his sentence of life in prison without parole.  We affirm the conviction and sentence.

**I.**
**Factual Background.**

Todd W. Carver (Defendant) was found guilty by a jury of murdering a three-year-old boy who was the son of Defendant's live-in girlfriend.  The child suffered multiple blows to his head, causing bilateral subdural hematomas, and there was bruising on his neck consistent with strangulation.  The district court sentenced Defendant to life in prison without the possibility of parole.  He appeals, challenging the failure of the district court to appoint substitute counsel, the jury instructions defining the crime, and the sentence imposed.

## II.
## Did the District Court Err in Failing to Appoint Substitute Counsel?

On April 4, 2011, a public defender was appointed to represent Defendant in this case. The preliminary hearing was held on April 13, 2011, and Defendant was bound over to answer to the charge in district court. The information charging murder in the first degree was filed on April 14, 2011, and on April 21, 2011, Defendant entered a plea of not guilty to that charge. The case was eventually set for a jury trial to begin on September 19, 2011.

On September 8, 2011, Defendant, through his public defender, filed a motion to dismiss counsel. The motion stated that it was made "at the express direction of the defendant for reasons the defendant will articulate on the record at the hearing of this motion." The motion was heard by the district court on September 13, 2011. On that date, defense counsel filed an ex parte affidavit in support of the motion. In that affidavit, defense counsel stated that he felt threatened by Defendant's conduct during their meeting earlier that day. He described what occurred as follows:

> On September 13, 2011 at approximately 11:00 a.m. I met with the defendant in the Idaho County jail attorney visiting room. During the meeting the defendant became agitated and told me that he no longer had anything to say and did not want to talk to me anymore about the case. I continued to make a point to the defendant, and the defendant quickly became more agitated. The defendant shouted at me and struck the side of his fist hard on the door behind him. The defendant then looked directly at me with what I took as a menacing glare. The defendant shouted for the jail staff to come get him and I also knocked on the door to summon jail staff. Jail staff took the defendant back to his cell. While the defendant was being taken back to his cell he continued to make angry comments, and when he was placed in his cell he continued to yell and to strike things.

Defense counsel concluded his request for permission to withdraw by stating, "The defendant's conduct and my fear for my safety will be a distraction to me throughout the trial and any subsequent proceedings, and I will not be able to impartially and zealously represent the defendant or advocate on his behalf."

The district court began by asking defense counsel about the motion. He answered that he had filed the motion at the request of Defendant but knew nothing further. The court then inquired of Defendant, who recited a list of grievances against his defense counsel. He stated that he had asked his counsel to get an investigator and a forensic specialist and had given him a

list of witnesses to interview, but counsel had not done those things. He also did not like his counsel's suggestion that if he admitted some fault, he may be able to receive a reduced charge.

The court then questioned defense counsel. He stated that he had considered obtaining an investigator and medical expert, but did not consider either to be helpful. He had also talked to some of the witnesses Defendant had identified, but there was only one who could potentially be helpful, and he did not need to talk with the others.

The court then questioned the deputies who were present at the jail during the morning outburst by Defendant while he was meeting with his defense counsel. They both said that Defendant did not do anything other than hit the walls and that they did not hear Defendant say anything in a threatening manner.

The court then addressed Defendant again, explaining the role of defense counsel and informing Defendant he could represent himself if he desired or retain his own counsel. Defendant stated that he did not want to represent himself and did not have the money to hire an attorney. During their dialogue, Defendant stated "as far as I know told that there's nothing presented in my behalf because I don't have a defense. I thought that's what a defense attorney was for." After further dialogue, the court asked Defendant if he intended to threaten his counsel physically, and Defendant said he did not. Defense counsel stated that he did not have anything further to say, and the prosecuting attorney was given an opportunity to speak.

The hearing on the motion to dismiss counsel was heard on Tuesday, September 13, 2011, and the trial was set for Monday, September 19, 2011. Then the court asked defense counsel if he "can and would be prepared for trial on Monday", and defense counsel answered, "Yes." The court then asked Defendant if he would continue working with his counsel, and Defendant answered, "I guess I'll try to continue to work with him because apparently everything is out of my control."

"A trial court may appoint substitute counsel for an indigent defendant upon a showing of good cause. Whether substitute counsel should be provided is a decision that lies within the sound discretion of the trial court and will be reviewed on appeal for an abuse of discretion." *State v. Severson*, 147 Idaho 694, 702, 215 P.3d 414, 422 (2009). The Sixth Amendment to the Constitution of the United States has been construed to ensure that a defendant receives conflict-free counsel in state criminal proceedings. *Wood v. Georgia*, 450 U.S. 261, 271 (1981). "In order to ensure that a defendant receives conflict-free counsel, a trial court has an affirmative

3

duty to inquire into a potential conflict whenever it knows or "reasonably should know that a particular conflict may exist." *Severson*, 147 Idaho at 703, 215 P.3d at 423. "[A] trial court's examination of the potential conflict must be thorough and searching and should be conducted on the record." *Id*. at 704, 215 P.3d at 424.

On appeal, Defendant contends that the district court's inquiry was deficient in two areas. First, he argues that a client threatening his or her attorney with harm creates a conflict of interest. It is the court that determines whether a conflict actually exists. *Id*. During his dialogue with the court, Defendant stated that he did not intend to threaten his counsel physically. After Defendant disavowed any intent to harm his counsel, the court asked defense counsel if he wanted to say anything further, and defense counsel stated that he had nothing further to add. The court viewed Defendant, his counsel, and the officers as they answered the court's questions, and the court could judge their credibility and weigh their statements. During the dialogue, there was no indication that Defendant had any intent to harm his counsel.

Second, Defendant argues "the district court did not inquire into defense counsel's ability to provide competent and diligent representation (which is different than simply being ready to participate at trial on a given date)." Although Defendant seeks to parse counsel's words, there is no indication that defense counsel was unaware of his obligation to provide competent and diligent representation to Defendant when counsel stated he could be and would be ready for trial.[1] "[I]n determining whether a conflict exists, trial courts are entitled to rely on representations made by counsel." *Id*.

The district court made a thorough and searching inquiry into whether there was a conflict based upon defense counsel's belief that Defendant had threatened to harm him. Defendant stated that he did not intend to harm his attorney, and it was apparent from the dialogue that Defendant was merely frustrated that there was no defense to his crime and that his defense counsel could not create one out of thin air. The district court did not err in failing to allow Defendant's counsel to withdraw and to appoint substitute counsel.

---

[1] Rule 1.1 of the Idaho Rules of Professional Conduct states, "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation," and Rule 1.3 states, "A lawyer shall act with reasonable diligence and promptness in representing a client."

### III.
### Did the District Court Err in Instructing the Jury as to the Elements of the Crime?

Defendant was convicted of murder in the first degree by committing an aggravated battery upon a child under twelve years of age. With respect to the elements of that crime, the district court instructed the jury as follows:

INSTRUCTION NO. 4

In order for the defendant to be guilty of First Degree Murder in the perpetration of an aggravated battery upon a child under twelve (12) years of age, the state must prove each of the following:

1. On or about March 3, 2011,
2. in the state of Idaho
3. Todd William Carver committed an aggravated battery upon [the child]
4. Which caused [the child] great bodily harm,
5. From which bodily harm [the child] died, and
6. That [the child], at the time of his death, was under twelve (12) years of age.

To prove Todd William Carver guilty of first degree murder in this way, the state does not have to prove that the defendant intended to kill [the child], but the state must prove that during the perpetration of an aggravated battery on a child under twelve (12) years of age, the defendant killed [the child].

If you find that the state has failed to prove any of the above, you must find the defendant not guilty of first degree murder. If you find that all of the above have been proven beyond a reasonable doubt, then you must find the defendant guilty of first degree murder.

INSTRUCTION NO.5

An "aggravated battery" is a "battery" that causes great bodily harm,

A "battery" is committed when a person:
(1) willfuly and unlawfully uses force or violence upon the person of another; or
(2) actually, intentionally and unlawfully touches or strikes another person against the will of the other; or
(3) unlawfully and intentionally causes bodily harm to an individual.

An act is "willful" or done "willfully" when done on purpose. One can act willfully without intending to violate the law, without intending to injure another, or without intending to acquire any advantage.

Defendant contends that the above instructions were in error because they did not instruct the jury that, to find Defendant guilty of first degree murder, the jury must find that he intended to cause the child great bodily harm. Because Defendant did not timely object to the jury instructions in the trial court, this assignment of error is only reviewable under Idaho's

5

fundamental error doctrine. *State v. Adamcik*, 152 Idaho 445, 472-73, 272 P.3d 417, 444-45 (2012). "Before we consider whether there was fundamental error, we must first determine whether the trial court erred at all." *Id*. at 473, 272 P.3d at 445.

Idaho Code section 18-4003(d) provides, "Any murder committed in the perpetration of, or attempt to perpetrate, aggravated battery on a child under twelve (12) years of age . . . is murder of the first degree." Quoting *State v. Pina*, 149 Idaho 140, 233 P.3d 71 (2010), Defendant states, "Idaho's felony murder rule requires a finding that each participant had the specific intent to commit the underlying felony . . . ." *Id*. at 147, 233 P.3d at 78. The underlying felony alleged in this case was aggravated battery, which requires that in committing a battery the defendant must have "[c]aused great bodily harm." I.C. § 18-907(1)(a). Therefore, Defendant contends that the jury should have been instructed that to find him guilty, the jury must find that he intended to cause great bodily harm when he committed a battery upon the child. He asserts, that in order to convict him of felony murder, "not only did the jury have to find that Mr. Carver had the requisite mental state to commit an aggravated battery, *it also had to find that he had the specific intent to cause great bodily harm to [the child]*."

In making this argument, Defendant relies upon the quotation from *Pina* and the case it cited, which was *State v. Scroggins*, 110 Idaho 380, 716 P.2d 1152 (1985). Neither case supports Defendant's argument, because the issue in both cases was whether an alleged participant in a killing could be liable under the felony-murder rule if that participant had no intent to commit the underlying felony. Here, the defendant acted alone.

In *Scroggins*, the defendant was convicted of felony murder based upon a killing committed during the perpetration of an attempted rape. 110 Idaho at 382, 716 P.2d at 1154. He and his co-defendant, who actually killed the victim, were tried at the same time with separate juries. They both testified. Scroggins argued on appeal that the district court erred in failing to instruct the jury regarding accomplice testimony. In addressing the issue of whether Scroggins was an accomplice to the underlying felony committed by his co-defendant, this Court stated, "In a prosecution for felony-murder, the state is relieved of the burden of proving that a defendant had the specific intent to kill and instead need only prove that all individuals charged as principals had the specific intent to commit the predicate felony." *Id*. at 386, 716 P.2d at 1158.

In *Pina*, we discussed more thoroughly whether Idaho's felony murder rule incorporated the agency theory or the proximate-cause theory. We explained the two theories as follows:

Under the agency theory, the felony-murder rule is only applied to actors who are acting in concert in furtherance of a common plan or scheme to commit the underlying felony and one of them causes the death during the perpetration of the felony, regardless of who actually fired the fatal shot. Under the proximate-cause theory, each actor is held responsible for the death of a person caused during the perpetration of a felony if it was reasonably foreseeable that the acts committed might reasonably be expected to result in death.

149 Idaho at 144, 233 P.3d at 75 (footnotes omitted). In analyzing that issue, we noted that the felony murder rule had never been applied by an appellate court in Idaho "that resulted in a person involved in the commission of a felony being held responsible for a killing caused by a third person not involved in the underlying felony." *Id*. at 146, 233 P.3d at 77. We also stated, "Additionally, this Court indicated in *State v. Scroggins*, 110 Idaho 380, 716 P.2d 1152 (1985), that Idaho's felony murder rule requires a finding that each participant had the specific intent to commit the underlying felony." *Id* at 147, 233 P.3d at 78.

In both cases, the issue was whether a defendant who did not commit the killing could be convicted of felony murder if the defendant had no intent to commit the underlying felony. In each case, we held that the defendant who did not commit the killing must have intended to commit the underlying felony in order to be guilty of first degree murder under the felony murder rule. In this case, there is no co-defendant who is the one who actually killed the child. Defendant was the only one involved. He was alone with the child when the child was killed. Therefore, *Pina* and *Scroggins* have no application to this case.

As Defendant conceded during oral argument, the crime of aggravated battery does not require any intent to cause great bodily harm. A battery becomes an aggravated battery if in committing a battery the person causes great bodily harm. I.C. § 18-907(1)(a). A battery becomes aggravated battery because of the harm caused, not because of the intent to cause that harm. Here, the district court correctly instructed the jury that Defendant would be guilty of first degree murder if he committed a battery upon the child which resulted in great bodily harm, from which the child died. Instructing the jury that Defendant had to have intended to cause great bodily harm to the child would not have been an accurate statement of the law.

## IV.
### Did the District Court Abuse Its Discretion in Sentencing Defendant to Life in Prison Without Parole?

7

The district court sentenced Defendant to life in prison without the possibility of parole. Defendant contends that the court abused its discretion in doing so.

Defendant was paroled from prison on December 22, 2010, and on the same day he moved into his grandmother's house in Grangeville. He occupied the upstairs, which consisted of three bedrooms. His grandmother's bedroom was on the first floor, as were the bathroom, the kitchen, and the living room. In January 2011, Defendant moved his girlfriend and her two children into the upstairs with him. His girlfriend had a three-year-old son by a prior relationship and an eighteen-month-old son from her marriage to her husband, from whom she was separated. Defendant was unemployed, and his girlfriend had a full-time job. When she was at work, Defendant watched the two boys.

In mid-February 2011, the girlfriend's husband had both boys for the weekend. He stated that he gave both boys a bath, and neither of them was bruised. Later in February, Defendant's grandmother began noticing bruising on the three-year-old. She testified that while they were sitting at the kitchen table, Defendant told the three-year-old that if he did not leave Defendant's candy bars alone, "I'll bury you so deep nobody will find you." She said that when making that statement, Defendant's demeanor was "[m]ean, scary, he meant business." The grandmother also testified to three incidents of Defendant's harsh discipline of the child. In the latter part of February, Defendant stated that he had slammed the upstairs window down on the child's hands as hard as he could. He stated that he did it in order to teach the child not to open the window. In an offer of proof presented to the court outside the presence of the jury, the grandmother testified to the other two incidents. About ten days before the killing, Defendant disciplined the child by having him take off his jeans and then, while holding the child's shoulder with one hand, Defendant "hit him extremely hard." When asked to describe how hard, the grandmother answered, "If I ever got hit that hard probably knock me out." On March 2, 2011, the child was sick, and he vomited onto his plate and the table after eating. Defendant tried to force the child to eat the vomit, but the grandmother intervened.

The grandmother also testified outside the presence of the jury to facts indicating that Defendant could have been motivated by racial animus. The grandmother stated that Defendant did not like the child because the child's father was African American and Defendant had said that "he hated niggers." She said he made that statement three or four times and that his

8

demeanor when doing so was "hateful." When asked why she thought it was hateful, she stated, "He definitely hated black people is why I say that."

On March 3, 2011, Defendant's girlfriend left for work at 1:35 p.m., and the grandmother followed her out of the house to have coffee with some friends. Defendant was left to care for the two boys. One hour later, Defendant called 911 and reported that the three-year-old had been sitting on a bed eating doughnuts, Defendant heard a thud from the bedroom and he went into the room and found the boy on the floor, rigid, and barely breathing.

The police officer who responded to the grandmother's house talked with Defendant to find out what had happened. He described Defendant's demeanor as "[u]nemotional, apathetic, I mean, just without seeming a care." He testified that Defendant's voice was monotone and that he was not crying, nor did he appear to be upset or excited. The emergency medical technician who arrived at the house also described Defendant as "[d]etached, uninvolved." After the ambulance had transported the boy to the hospital and he was in the emergency room, Defendant and the boy's mother went outside and stood near the back door. The ambulance driver testified that he returned to the ambulance to clean it and get it ready in case they were called on another run. While doing so, he observed Defendant and the mother for twenty minutes. He stated that Defendant was smoking and laughing and that he and the boy's mother were "kissing part of the time, kind of laughing and carrying on."

Defendant testified that the child was injured when he fell off a twenty-two-inch high bed onto an area of floor that was carpeted and also covered by a rug. There was no medical testimony that such a fall could have caused the child's injuries.

There was also no evidence corroborating Defendant's claim that the child had been eating chocolate doughnuts while on the bed. The medical personnel did not find any trace of food in the child's throat or mouth, nor was there any trace of chocolate on the child's face. After a helicopter had picked up the child to transport him to another hospital, the grandmother returned home and searched the bedroom, including crawling on the floor and looking under the bed, for any crumbs or other evidence that the child had been eating doughnuts, and she could not find any.

The autopsy of the child was performed by a pathologist who was board certified in forensic pathology and in clinical and anatomic pathology and who had performed 7,000 to 8,000 autopsies. She determined that the cause of death was "herniation of the brain due to

9

bilateral, meaning on both sides, bilateral subdural hemorrhage and swelling of the brain due to blunt impact to the head." She described herniation as the process "where the brain tries to come down the spinal canal because of swelling."

The child did not suffer a single impact to his head. The pathologist testified that a fall from the bed would have led to a single impact, but in this case there were "at least six different impact sites or subgaleal areas of hemorrhage, maybe more, depending on what you count and how you count them so that's the low end possible." She explained that it was difficult to count the number of impacts to the child's head because some of the areas of hemorrhage merged together and multiple impacts in the same area would have caused only one hemorrhage.

When asked whether the injuries suffered by the child could have been accidental, she answered, "No." She explained that the number and distribution of bruises all over the child's body that were caused by blunt force trauma was not consistent with an accidental injury. She described the bruises as follows:

> So that as you recall from the photographs the subgaleal hemorrhage there were multiple areas, and not only were there multiple areas, but they were found on the front of the head and the back of the head, above both ears and between the ears and the top of the head. So they're on all of the surfaces of the scalp, if you will, the front, the back, the sides, near the top. So there's not a way that a child would have injuries on multiple body surfaces like that, multiple scalp surfaces by way of an accident. And then if you go below the head the injuries are in the same distribution. They're on the back of the body, the arms, the legs, and the torso. So they're on the front and the back, the sides of the body. So when children injure themselves they usually do it on exposed body prominences. So injuries on the back of the body, and you know this from your own experience, are unusual in children. So are injuries on all surfaces of the head that are accidental, I'm talking about. And children get bumped knees and shins, but injuries to the feet are uncommon. Injuries to the penis are uncommon in the daily routine of children. So the number of distribution of bruises on the body and on the scalp make this non-accidental.

When imposing the fixed life sentence, the district court focused upon Defendant's lack of rehabilitative potential. The court stated:

> As far as cutting against rehabilitation your record as both a juvenile and as an adult, not only the crimes that you've been convicted of and have admitted, but your behavior while on probation, while incarcerated and so forth, shows that you don't follow the rules, whether you're incarcerated or whether you're outside of incarceration. You had a number of write-ups while you were incarcerated. You couldn't finish a rider program. You've had write-ups while you were in jail

here. You were on probation when you committed other offenses. All of this tends to point to the fact that maybe you can't be rehabilitated. . . . .

It appears to me that as pointed out since 16 you've been incarcerated most of the time. You haven't complied with the rules while incarcerated. You haven't complied with the rules outside of incarceration. I've come to the conclusion when I went through all of this and thought about it at some length, and quite a bit of length—you know, and I'm a person that believes in rehabilitation. Every time I get a chance I would like to see that happen, set up a program where that can happen, the possibility where that can happen. Mr. Carver, in your case I can't get to that point. I just don't believe based upon what I've seen that you can change. I wish I was wrong, but I don't find that there's any reasonable likelihood that you will, in fact, change your behavior and be a law abiding citizen in the future.

The sentence in this case is within the statutory limits. When reviewing a sentence within the statutory limits, the defendant bears the burden of demonstrating that the trial court committed a clear abuse of its discretion. *State v. Stevens*, 146 Idaho 139, 148, 191 P.3d 217, 226 (2008). We will not substitute our view of a reasonable sentence for that of the trial court where reasonable minds might differ. *Id*. at 148-49, 191 P.3d at 226-27. In determining whether the trial court abused its discretion, we conduct "an independent review of the entire record available to the trial court at sentencing, focusing on the objectives of criminal punishment: (1) protection of society; (2) deterrence of the individual and the public; (3) possibility of rehabilitation; and (4) punishment or retribution for wrongdoing." *Id*. at 148, 191 P.3d at 226. To impose a fixed life sentence "requires a high degree of certainty that the perpetrator could never be safely released back into society **or** that the nature of the offense requires that the individual spend the rest of his life behind bars." *Id*. at 149, 191 P.3d at 227 (emphasis added).

Defendant argues that the district court abused its discretion by failing to give greater weight to Defendant's youth (he was age 21 when he committed the murder), his troubled childhood (one of his parents abused alcohol and drugs, and his grandfather, with whom he was very close, died when Defendant was thirteen years of age), and the diagnosis during his childhood of attention deficit hyperactivity disorder and bipolar disorder. Considering the brutal and unprovoked injuries that Defendant inflicted upon a helpless and innocent child, Defendant has not shown that the district court abused its discretion in imposing a fixed life sentence.

11

**V.**
**Conclusion.**

We affirm Defendant's conviction and sentence.

Chief Justice BURDICK, Justices J. JONES, HORTON and J. Pro Tem SCHROEDER **CONCUR.**