# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 43621-2015

STATE OF IDAHO, )
) Boise, May 2017 Term
    Plaintiff-Respondent, )
) 2017 Opinion No. 90
v. )
) Filed: July 17, 2017
SHAWN NATHAN FISHER. )
) Karel A. Lehrman, Clerk
    Defendant-Appellant. )
)

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, in and for Ada County. Hon. Jason D. Scott, District Judge.

The judgment of the district court is affirmed.

Jason C. Pintler, Deputy State Appellate Public Defender, Boise, argued for appellant.

Jessica M. Lorello, Deputy Attorney General, Boise, argued for respondent.

_____

EISMANN, Justice.

This is an appeal out of Ada County challenging the statutory elimination of the insanity defense and the imposition of a determinate life sentence for the crime of murder in the second degree that was committed when the defendant was experiencing paranoia resulting from schizophrenia and was under the influence of bath salts. We affirm the judgment of the district court.

## I.

## Factual Background.

On February 18, 2013, while under the influence of a controlled substance, suffering from schizophrenia, and experiencing paranoia and a delusion that he and his family were in danger, Shawn Nathan Fisher ("Defendant") killed one person and attempted to kill another.

At 8:25 p.m., a 911 operator received a call about a possible murder. The caller reported that he was driving home from work on a four lane road, when he came up behind a car stopped

in his lane of travel at an intersection. He stopped, and, after waiting for the traffic to clear, he pulled around the car. When he did so, he noticed that the driver was slumped over in the driver's seat. Thinking that the driver may have had a heart attack, he turned around and drove back to the car to check on its driver. When he walked up to the car, the driver's window had been rolled down, and he saw that there was blood pouring from the driver's head. The car was still running, so he turned it off. He also checked the driver's neck for a pulse, and could not feel one. The manual transmission was in neutral. It was later determined that the driver had been shot in the face. The bullet hit the left side of his nose and traveled to the rear of his head, slightly to the right, passing through the brain. The victim was 28 years of age, and was driving home from work. The outside temperature was thirty degrees. Because the driver's window was rolled down and there was a small pool of blood on the roadway beneath the driver's door and blood running down the side of the vehicle, Defendant may have stopped beside the victim's car at the traffic light and motioned to him to roll down his window before shooting him.

At 8:26 p.m., a 911 operator received a call that the operator interpreted as being about leaving the scene of an accident. The caller had left his apartment complex shortly after 8:00 p.m., to go to the store where he worked to visit his friends and make a purchase. Then he intended to drive to the university he attended to drop off a heat gun for use the next morning on an art project. After getting into his car and starting to drive away, he realized that he had forgotten the heat gun. He stopped his car, backed up, and parked parallel to the parking stalls. It took him about five minutes to go back into his apartment, grab the heat gun, and return to his car. Upon returning, he saw another car stopped about fifty feet away facing his car. The other car's headlights were on, and it was running. The victim thought at first that he may be blocking a parking stall, but, after waiting a few minutes, he drove past the other car, out of the apartment complex, and onto a two-lane street. The other car left the apartment complex using another driveway. While driving down the street, the victim noticed the other car coming up behind him very quickly. As the victim approached the intersection with a five-lane street (two lanes in each direction and a center turn lane), the other car slammed into the rear of the caller's car. He turned south into the outer lane of a five-lane street, and the other car pulled alongside in the inner lane. He looked towards the other car, saw the front passenger window explode outward, and heard a bullet hit his car near his ear. The other car then sped away southbound. The caller

2

wanted to find a safe place before calling the police, so he drove to the store where his friends were.

There is no indication that Defendant previously had any contact with either victim. He apparently selected them at random. After his arrest, it was determined that Defendant was also under the influence of bath salts.

Defendant was ultimately charged with murder in the first degree and several other crimes, but on October 3, 2013, the district court found him unable to assist in his own defense due to his mental illness. The court committed Defendant to the custody of the Department of Correction for care and treatment. On February 17, 2015, the court terminated the commitment because Defendant was determined to be competent to proceed.

On May 15, 2015, Defendant filed a motion seeking to have the statutory abolition of the insanity defense declared to be unconstitutional. On June 17, 2015, the district court denied the motion.

On June 25, 2015, the prosecutor, defense counsel, and Defendant entered into a binding plea agreement, which provided that Defendant would plead guilty to murder in the second degree, the remaining charges would be dismissed, and Defendant would reserve the right to appeal the district court's denial of his motion to declare unconstitutional the statutory abolition of the insanity defense. There was no agreement as to the sentence.

On July 1, 2015, the State filed an amended information reducing the charge of murder in the first degree to murder in the second degree. On the same day, Defendant pled guilty to murder in the second degree. The district court held a sentencing hearing on September 30, 2015, and at the conclusion of the hearing the court sentenced Defendant to a determinate life sentence with no possibility for parole. Defendant then timely appealed.

## II.

### Denial of the Motion to Declare Unconstitutional the Statutory Abolition of the Insanity Defense.

In 1982, the Idaho legislature repealed former Idaho Code section 18-209, which made mental disease or defect an affirmative defense in a criminal proceeding. In its place the legislature enacted Idaho Code section 18-207. That statute provides, "Mental condition shall not be a defense to any criminal charge." I.C. § 18-207(1). However, it does not preclude

3

evidence regarding a defendant's state of mind if it is an element of the charged offense. The statute also provides, "Nothing herein is intended to prevent the admission of expert evidence on the issue of any state of mind which is an element of the offense, subject to the rules of evidence." The State is still required to prove beyond a reasonable doubt any state of mind that is an element of the offense charged. In addition, if the defendant is convicted, the trial court is required to consider, if offered, evidence of the defendant's mental condition. I.C. § 19-2523(1).

On appeal, Defendant contends that the abolition of the insanity defense violates the Due Process Clause of the Fourteenth Amendment and the Eighth Amendment. Defendant admits that we have on numerous occasions rejected claims that the abolition of the insanity defense violated the Federal Constitution. *State v. Delling*, 152 Idaho 122, 267 P.3d 709 (2011); *State v. Moore*, 126 Idaho 208, 880 P.2d 238 (1994); *State v. Odiaga*, 125 Idaho 384, 871 P.2d 801 (1994); *State v. Gomez*, 126 Idaho 83, 878 P.2d 782 (1994); *State v. Winn*, 121 Idaho 850, 828 P.2d 879 (1992); *State v. Card*, 121 Idaho 425, 825 P.2d 1081 (1991); *State v. Searcy*, 118 Idaho 632, 798 P.2d 914 (1990). The most recent decision on the issue from the United States Supreme Court is *Clark v. Arizona*, 548 U.S. 735 (2006), which this Court considered in *Delling*. "Having previously decided this question, and being presented with no new basis upon which to consider the issue, we are guided by the principle of *stare decisis* to adhere to the law as expressed in our earlier opinions." *Odiaga*, 125 Idaho at 388, 871 P.2d at 805.

**III.**

**Did the District Court Abuse Its Discretion in Sentencing?**

"When reviewing whether a sentence is excessive, we review all the facts and circumstances in the case and focus on whether the trial court abused its discretion in fixing the sentence." *State v. Baker*, 136 Idaho 576, 577, 38 P.3d 614, 615 (2001). "When reviewing a fixed life sentence, the primary factors considered are the gravity of the offense and/or the need to protect society from the defendant." *State v. Cannady*, 137 Idaho 67, 73, 44 P.3d 1122, 1128 (2002). If the sentence is within the statutory limits, "the defendant bears the burden of demonstrating that the trial court committed a clear abuse of its discretion," and "[w]e will not substitute our view of a reasonable sentence for that of the trial court where reasonable minds might differ." *State v. Carver*, 155 Idaho 489, 496, 314 P.3d 171, 178 (2013). When considering whether the sentence was an abuse of discretion, "this Court considers: (1) whether

4

the trial court correctly perceived the issue as one of discretion; (2) whether the trial court acted within the boundaries of its discretion and consistently with the legal standards applicable; and (3) whether the trial court reached its decision by an exercise of reason." *State v. Miller*, 151 Idaho 828, 834, 264 P.3d 935, 941 (2011).

"The objectives of criminal punishment are protection of society, deterrence of the individual and the public, possibility of rehabilitation, and punishment or retribution for wrongdoing, with the primary objective being the protection of society." *State v. Jimenez*, 160 Idaho 540, 544, 376 P.3d 744, 748 (2016). "The district court has the discretion to weigh those objectives and give them differing weights when deciding upon the sentence." *State v. Bailey*, 161 Idaho 887, 895, 392 P.3d 1228, 1236 (2017). The district court considered all four objectives, but decided in its discretion that the two most important were the protection of society and punishment.

With respect to protecting society, the court stated, "It is clear that Mr. Fisher, particularly in an unmedicated state, presents a profound risk to the public because of his mental health condition and his history of drug use." The forensic psychiatrist who testified at the sentencing hearing diagnosed Defendant as having schizophrenia, a major depressive disorder, and several substance abuse issues. She testified that in general schizophrenia "occurs in someone's late adolescence at the earliest and usually in the individual's twenties," that "[i]t's something that most people suffer from for the rest of their lives." Defendant was thirty-five years old when he committed this murder. She added: "Once it is identified and diagnosed, which it had not been in his case, the prognosis is better in the sense that with treatment, the symptoms can be reduced significantly. For a majority of people, they don't go away completely." With respect to Defendant, she stated: "If he doesn't have that treatment, he would be like he was when he was arrested and just in jail for that first eight months. So it's essential that he gets treatment to keep those symptoms at bay." When asked about the typical duration of the treatment for schizophrenia and whether the diagnosis changes, the psychiatrist answered that "typically most individuals have persistent symptoms, and they usually don't come off of the medication" and that the diagnosis "[i]s usually consistent for the duration of their life."

With respect to punishment for the crime, the district court stated that "[w]e also have the other factor that appears to me to be the most significant here is the need to impose a punishment that fits the crime" and that "anything less than a very lengthy prison sentence would depreciate

5

the seriousness of this offense." When Defendant pled guilty, he admitted that he willfully shot at the victim; that he aimed his revolver at the victim and meant to pull the trigger; that he did not intend to kill the victim, but intended to shoot him; and that he knew of the danger and had a conscious disregard for the victim's life.

With respect to Defendant's future risk of violence, the psychiatrist stated that "[i]f someone has committed a prior act of violence, that will increase someone's risk of violence"; "[i]f someone has a mental illness that has got active symptoms, that increases their risk"; and that "[s]omeone with an active substance abuse issue who is abusing drugs and alcohol would have—that's probably the highest risk for violence." Conversely, his risk to commit violence in the future would be reduced by understanding his mental health diagnosis and his need for medication and by abstaining from abusing drugs and alcohol. In the psychiatrist's opinion, Defendant's behavior in killing the victim was based upon both his mental illness and being under the influence of the illegal drug.

The district court considered mitigating factors, including that Defendant had a minimal prior criminal record, that he held a steady job for many years before quitting just before these criminal events, and that he had done nothing to cause his schizophrenia. The court also considered that Defendant had declined medication in the past (when he was initially in jail before he was treated) and that the victims were selected at random.

After considering all of the information available to it, the district court stated that it did not believe that there "was a realistic prospect that Mr. Fisher could safely be returned to the future—to the public at some future point without a meaningful risk, that he would engage in some kind of violent conduct like this again in the future." The court concluded that the appropriate sentence was life without parole.

On appeal, Defendant contends that the district court abused its discretion because "[t]here is no reason to believe that a medicated Shawn Fisher would pose a threat to public safety in the future"; "[t]he fixed life sentence imposed in this case is nothing more than a hedge against the district court's uncertainty that Mr. Fisher would be medication compliant in the future"; and "[t]here is nothing in the record to suggest that after at least seven and one-half

additional years of understanding that he is schizophrenic and taking medications to help him control his delusions, Mr. Fisher would not be medication compliant."[1]

"To impose a fixed life sentence 'requires a high degree of certainty that the perpetrator could never be safely released back into society **or** that the nature of the offense requires that the individual spend the rest of his life behind bars.'" *State v. Carver*, 155 Idaho 489, 496, 314 P.3d 171, 178 (2013). This statement refers to these two factors standing alone. In this case, the district court found both of these factors to be the predominant ones. The court concluded that there was not a "reasonable prospect" that Defendant could be safely returned to society and that the punishment must fit the crime. "The considerations of societal retribution and general deterrence are not decided on the basis of the unique characteristics of the *offender*; rather these considerations are decided upon the characteristics of the *offense. State v. Windom*, 150 Idaho 873, 880, 253 P.3d 310, 317 (2011) (footnote omitted).

Defendant has not shown that the court committed a clear abuse of discretion in imposing the fixed life sentence.

## IV.
### Conclusion.

We affirm the judgment of the district court.


Chief Justice BURDICK, and Justices HORTON and BRODY **CONCUR.**


JONES, J., concurring in part and dissenting in part.

I concur with Part II of the majority's opinion, but I respectfully dissent from Part III for two reasons. First, the majority's quotation of *State v. Windom* at the end of the opinion is susceptible to misinterpretation because it is taken out of context, overly broad, and incomplete. The majority opinion quotes *Windom* as follows: "The considerations of societal retribution and general deterrence are not decided on the basis of the unique characteristics of the offender;

---

[1] Idaho Code section 18-4004 states, "Every person guilty of murder of the second degree is punishable by imprisonment not less than ten (10) years and the imprisonment may extend to life." In making this argument, Defendant is assuming a mandatory minimum sentence of ten years in the custody of the Idaho Board of Correction, during which time Defendant would receive treatment and counseling.

rather these considerations are decided upon the characteristics of the offense." 150 Idaho 873, 880, 253 P.3d 310, 317 (2011). This quotation, standing alone, may be interpreted to mean that the characteristics of the offense, not the offender, are the focus of criminal punishment. That is incorrect. It must be emphasized that there are four objectives of criminal punishment: (1) protection of society; (2) deterrence of the individual and the public; (3) the possible rehabilitation of the individual; and (4) retribution for the crime. *State v. Jimenez*, 160 Idaho 540, 544, 376 P.3d 744, 748 (2016). These four considerations take into account the characteristics and circumstances of the offender in addition to the consideration of the heinous nature of the offense.

Second, the district court abused its discretion because its sentencing decision was not reached through an exercise of reason. The district court gave only nominal consideration to Fisher's well documented schizophrenia and based its sentencing decision on the protection of society and the nature of the offense. In my view, the district court should have considered the factors discussed in the following four cases: *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016); *Miller v. Alabama*, 567 U.S. 460 (2012); *State v. Windom*, — Idaho —, — P.3d — (2017); and *Johnson v. State*, 162 Idaho 213, 395 P.3d 1246 (2017). In *Miller v. Alabama* the United States Supreme Court declared that the Eighth Amendment forbids sentencing schemes that require mandatory life in prison without the possibility of parole for juvenile offenders. 567 U.S. 460, 478–79 (2012). The Court continued, stating that although a court may still sentence a juvenile offender to life in prison without the possibility of parole in homicide cases, it must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* The Court reasoned as follows:

> a sentencer misses too much if he treats every child as an adult. To recap: Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. . . . And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.

*Id*. at 460, 477–78 (2012). *Montgomery v. Louisiana* declared that the holding from *Miller* was retroactive for juveniles sentenced to mandatory life without the possibility of parole and for

8

juveniles sentenced by a court that did not consider the distinct attributes of youth. 136 S. Ct. 718, 734, 736 (2016). In *State v. Windom*, this Court reviewed the requirements of *Miller* and *Montgomery* and held that "[t]he sentencing hearing in Windom's case did not include evidence of the factors required by *Miller* and *Montgomery*, and therefore his sentencing did not comport with the requirements of those decisions." — Idaho —, — P.3d — (2017). In *Johnson v. State*, this Court affirmed a district court's ruling that Johnson's Eighth Amendment claims under *Miller* failed. 162 Idaho 213, —, 395 P.3d 1246, 1259 (2017). This Court noted that the trial court's "sentencing colloquy was approximately forty-four pages" and made "specific reference to having considered the testimony about Johnson's youth." *Id.* Ultimately, this Court held that the trial court "clearly considered Johnson's youth and all its attendant characteristics and determined, in light of the heinous nature of the crime, that Johnson, despite her youth, deserved life without parole." *Id.*

I recognize that *Miller*, *Montgomery*, *Windom*, and *Johnson* are not binding precedent because Fisher is an adult and his life sentence was not mandatory, but I am convinced that the reasoning from the aforementioned cases applies also to those suffering from mental disorders such as Fisher. Specifically, sentencing courts must take into account the possibility of rehabilitating offenders suffering from severe mental disorders before sentencing them to a lifetime in prison without the possibility of parole. We do not know whether severe mental disorders will one day be curable by medicine thereby rendering past offenders as good candidates for parole. That is a question best left to a fully informed parole board. In sum, using language from *Miller*, it was unreasonable to sentence Fisher to life without the possibility of parole before taking into account how those with mental disorders are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.