## IN THE SUPREME COURT OF THE STATE OF IDAHO
### Docket No. 42857

SARAH MARIE JOHNSON,                     )
                                         )       Boise, February 2017 Term
    Petitioner-Appellant,            )
                                         )       2017 Opinion No. 45
v.                                       )
                                         )       Filed: May 12, 2017
STATE OF IDAHO,                          )
                                         )       Stephen W. Kenyon, Clerk
    Respondent.                      )

---

Appeal from the District Court of the Fifth Judicial District, State of Idaho, Blaine County. Hon. G. Richard Bevan, District Judges.

Order dismissing successive petition for post-conviction relief, <u>affirmed.</u>

Nevin, Benjamin, McKay & Bartlett, LLP, Boise, for appellant. Dennis A. Benjamin argued.

Hon. Lawrence G. Wasden, Idaho Attorney General Boise, for respondent. Jessica Lorello, Deputy Attorney General argued.

---

BURDICK, Chief Justice.

Sarah Johnson appeals from the Blaine County district court's order dismissing her successive petition for post-conviction relief. On appeal, Johnson argues: (1) the district court erred in denying her request under Idaho Code section 19-4902 for additional DNA testing; (2) that in light of *Miller v. Alabama*, 132 S. Ct. 2455 (2012), and *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016), the district court erred in dismissing her Eighth Amendment claim because as a minor, the imposition of two fixed life sentences is cruel and unusual punishment; and (3) this Court's decision in *Murphy v. State*, 156 Idaho 389, 327 P.3d 365 (2014), which holds that ineffective assistance of post-conviction counsel does not constitute a sufficient reason for filing a successive post-conviction petition, should be overturned. We affirm.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Alan and Diane Johnson were shot and killed in their home on September 2, 2003. Sarah Johnson (Johnson), the Johnsons' sixteen year old daughter, was home at the time of the

1

shooting. Johnson consistently denied any involvement, but gave several different accounts of what she was doing, what she saw, and what she heard prior to and after the murders. However, in all accounts she fled the home either before hearing the second shot or immediately thereafter. After fleeing the house, she ran to a neighbors' house and the police were called. Johnson was ultimately charged with both murders.

Police found a leather glove from a pair usually kept in Diane's SUV, Johnson's keys, including a key to the guesthouse, the magazine of a nine-millimeter handgun wrapped in a bandana, and two .264 caliber magnum shells in Johnson's bedroom. In a garbage can outside of the residence the police also found a latex glove, a leather glove (matching the one found in Johnson's bedroom), and a pink robe covered in blood that belonged to Johnson and had .25 automatic pistol ammunition in the pocket. Testing revealed that Johnson's DNA was present inside of the latex glove and that paint chips found inside of the robe matched paint on the shirt Johnson was wearing on the morning of the murders.

The murder weapon, a .264 rifle, belonged to Mel Speegle, who was renting the Johnsons' guesthouse, but was out of town at the time of the murders. There were no prints on the rifle, scope, or ammunition that matched Johnson's. Speegle testified at trial that he kept the rifle in his closet, which was unlocked. Speegle also testified at trial that Johnson had access to the guesthouse, knew he would be gone the weekend before the murders, and knew that the rifle along with his other guns and ammunition were located in the closet. Johnson had a key to the guesthouse and had been in there several times including the days immediately preceding the murders. A physical examination of Johnson on the day of the murders revealed linear bruising on Johnson's left shoulder that would be consistent with gun recoil. Johnson testified that she got the bruising when she tripped over a coffee table at her boyfriend's house over the weekend.

In 2005, after a lengthy trial, a jury found Johnson guilty of the murder of her parents. *State v. Johnson* (*Johnson I*), 145 Idaho 970, 972, 188 P.3d 912, 914 (2008). She was sentenced to two fixed-life terms of imprisonment with a fifteen-year gun enhancement. *Id.* Johnson's first direct appeal was dismissed for failure to timely file a notice of appeal. *State v. Johnson* (*Johnson II*), 156 Idaho 7, 10, 319 P.3d 491, 494 (2014). Johnson then filed a petition for post-conviction relief alleging, among other things, ineffective assistance of counsel for her attorney's failure to timely file her notice of appeal. *Id.* The district court found ineffective assistance of counsel for the failure to timely file the notice of appeal and re-entered the conviction of

2

judgment. *Id.* Johnson then filed a timely notice of appeal, and the district court stayed proceedings on her remaining post-conviction claims pending resolution of the direct appeal. *Id.* On direct appeal, we affirmed the district court's judgment of conviction. *Johnson I*, 145 Idaho at 980, 188 P.3d at 922. Following resolution of her direct appeal, Johnson filed a second amended petition for post-conviction relief. *Johnson II*, 156 Idaho at 10, 319 P.3d at 494.

In her second amended petition for post-conviction relief, Johnson claimed, among other things, that:

> (1) her trial counsel was ineffective for failing to elicit testimony from Robert Kerchusky, the defense's fingerprint expert; (2) the unidentified prints on the murder weapon, its scope, and an insert from the box of ammunition were fresh; and (3) newly discovered evidence warranted a new trial. The newly discovered evidence claim was based on the discovery that Christopher Hill's fingerprints matched the previously unidentified prints on the murder weapon, its scope, and the ammunition.

*Id.* The district court held an evidentiary hearing on Johnson's claims and denied relief. Johnson appealed, and we affirmed. *Id.* at 13, 319 P.3d at 497. In regard to the newly discovered evidence, we noted that identifying the previously unidentified prints as Hill's did little to change the likelihood of Johnson's guilt and, in fact, due to Hill's credible testimony about why his prints were on the rifle, "[made] the fingerprint testimony even less valuable than it was at the time of the trial, when the defense could argue that a nameless third party handled the gun, the shells and removed the scope." *Id.*

On April 9, 2012, with the help of *pro bono* counsel, Johnson filed a DNA and Successive Petition for Post-Conviction Relief (Successive Petition) and, almost two years later, on January 22, 2014, an Amended DNA and Successive Petition for Post-Conviction Relief (Amended Successive Petition). Following Johnson's filing of the Amended Successive Petition, the district court ordered the Successive Petition, the Amended Successive Petition, and an affidavit by Dr. Greg Hampikian supporting the Successive Petition to be filed "*nunc pro tunc* to April 9, 2012, in a separate case and assigned a separate case number." Johnson's allegations in her Second Amended Petition can largely be narrowed down to three issues: (1) a request for DNA testing under Idaho Code section 19-4902(b); (2) a claim under *Miller* and *Montgomery* that her two fixed life sentences violate the Eighth Amendment; and (3) an ineffective assistance of post-conviction counsel claim alleging numerous deficiencies.

The State filed a motion for summary dismissal of Johnson's Amended Successive Petition, and the district court held a hearing on the State's motion. Following the hearing, the district court issued a written opinion in which it noted that Johnson conceded that the claims relating to ineffective assistance of post-conviction counsel were barred by *Murphy*. The court then discussed the remaining two issues—the request for DNA testing and the Eighth Amendment claim—and granted the State's motion for summary dismissal. Johnson timely appeals.

## II. STANDARD OF REVIEW

> Summary disposition of a petition for post-conviction relief is appropriate if the applicant's evidence raises no genuine issue of material fact. On review of a dismissal of a post-conviction relief application without an evidentiary hearing, this Court will determine whether a genuine issue of fact exists based on the pleadings, depositions and admissions together with any affidavits on file and will liberally construe the facts and reasonable inferences in favor of the non-moving party. A court is required to accept the petitioner's unrebutted allegations as true, but need not accept the petitioner's conclusions. When the alleged facts, even if true, would not entitle the applicant to relief, the trial court may dismiss the application without holding an evidentiary hearing. Allegations contained in the application are insufficient for the granting of relief when (1) they are clearly disproved by the record of the original proceedings, or (2) do not justify relief as a matter of law.

*Kelly v. State*, 149 Idaho 517, 521, 236 P.3d 1277, 1281 (2010) (quoting *Charboneau v. State*, 144 Idaho 900, 903, 174 P.3d 870, 873 (2007)).

## III. ANALYSIS

**A. Whether the district court erred in denying Johnson DNA testing under I.C. § 19-4902.**

Under Idaho Code section 19-4902, post-conviction testing of DNA is generally available to a petitioner when: (1) the evidence to be tested was not subject to the requested testing because the technology for the testing was not available at the time of the trial; (2) identity was an issue in the trial; (3) the evidence to be tested has been subject to a proper chain of custody; (4) the result of the testing has the scientific potential to produce new evidence that would show it is more probable than not that the petitioner is innocent; and (5) the testing method would likely produce admissible results under the Idaho Rules of Evidence. I.C. § 19-4902(b)–(e).

Johnson is seeking to have two different categories of DNA samples tested. The first involves DNA samples that were tested, analyzed, and profiled at the time of the trial but were unmatched when run through law enforcement databases. Johnson wishes to re-run these

4

samples through current law enforcement databases, which now include more DNA profiles with which to compare the samples.[1] The second category involves testing DNA samples, which due to their small size, were unable to be tested at the time of the trial. The district court denied post-conviction DNA testing on both categories of samples, ruling that the requested testing failed to meet the requirements of section 19-4902. Specifically, the district court found that: (1) Johnson's request to re-run the previously analyzed DNA samples through the expanded law enforcement database did not involve technology that was not available at the time of the trial; and (2) although the DNA samples that were too small to be tested previously did involve new technology, the testing did not have the scientific potential to produce new evidence that would show it is was more probable than not that Johnson was innocent. Johnson appeals both findings, and we address each in turn.

1. <u>Whether Johnson's request to re-run previously analyzed and tested DNA samples through current law enforcement databases constitutes a request for testing that was not conducted at trial "because the technology for the testing was not available at the time of trial," as required under Idaho Code section 19-4902(b).</u>

Idaho Code section 19-4902(b) states:

> A petitioner may, at any time, file a petition before the trial court that entered the judgment of conviction in his or her case for the performance of fingerprint or forensic deoxyribonucleic acid (DNA) testing on evidence that was secured in relation to the trial which resulted in his or her conviction but *which was not subject to the testing that is now requested because the technology for the testing was not available at the time of trial*.

I.C. § 19-4902(b) (emphasis added). Thus, under the statute, post-conviction DNA testing is only available if the requested testing relies on technology that was not available at the time of the original trial. Johnson argues that her request to compare a number of unidentified but already analyzed and compiled DNA profiles with Christopher Hill's DNA profile and an updated DNA profile database satisfies this requirement.

In support of her argument, Johnson points to a definition of technology found in Merriam-Webster's online dictionary defining technology as "a manner of accomplishing a task especially using technical processes, methods, or knowledge <new technologies for information

---

[1] Specifically, Johnson wishes to compare these profiles to those in the FBI's current Combined DNA Index System (CODIS) database.

storage>."[2] Focusing on the knowledge aspect of the definition of technology, Johnson argues that the now available DNA profile of Christopher Hill and additional DNA profiles in the CODIS database are new knowledge, i.e., technologies, that were not available at the time of trial. Thus, Johnson asserts that her request to compare unmatched and unidentified DNA samples that were collected and profiled at the time of trial to these newly available profiles encompasses technology that was not available at the time of trial. Johnson further asserts this definition of technology is supported by the legislative purpose of section 19-4902.

When interpreting the meaning of a word in a statute, this Court exercises free review. *State v. Lee*, 153 Idaho 559, 561, 286 P.3d 537, 539 (2012). In the absence of a statutory definition, "[t]he language of a statute should be given its plain, usual and ordinary meaning." *Albee v. Judy*, 136 Idaho 226, 231, 31 P.3d 248, 253 (2001). To ascertain the ordinary meaning of an undefined term in a statute, this Court often turns to dictionary definitions of the term. *E.g.*, *Marek v. Hecla, Ltd.*, 161 Idaho 211, ___, 384 P.3d 975, 980 (2016); *Arnold v. City of Stanley*, 158 Idaho 218, 221, 345 P.3d 1008, 1011 (2015).

Technology, as pointed out by Johnson, is defined as: "a manner of accomplishing a task especially using technical processes, methods, or knowledge." Thus, broken down, technology is broadly the "manner of accomplishing a task" and particularly "the manner of accomplishing a task using technical processes, methods or knowledge." In both the broader and particular senses of the word, the focus is on the "manner of accomplishing a task." But in the particular meaning, the manner of accomplishing the task is narrowed to the technical aspects of accomplishing the task, i.e., the "nuts and bolts" of how the task is accomplished. Johnson, however, suggests that technology can be defined by the simple increase of knowledge, i.e., that increased knowledge or data standing alone is technology. However, this interpretation overlooks the primary definition of technology, which requires not an increase or change in knowledge, but rather the technical or practical application of that knowledge to a manner of accomplishing a task to produce a new capability.[3] More simply, technology encompasses technical knowledge, which is the knowledge

---

[2] This definition is almost verbatim the one used by the district court: "[A] manner of accomplishing a task esp. using technical processes, methods, or knowledge." (quoting *Merriam-Webster's Collegiate Dictionary* 1206 (10th ed. 2001)).

[3] The full definition of technology from the same online dictionary used by Johnson defines technology as:

**1 a**: the practical application of knowledge especially in a particular area: engineering <medical *technology*>

6

relied on to change the "nuts and bolts" of how a task is accomplished. Rather than the simple *increase* or availability of knowledge, it is the *application* of knowledge to a specific process or method of accomplishing a task that is included in the definition of technology.

Here, the availability of Christopher Hill's DNA profile and the increase in DNA profiles in the CODIS database do not involve the application of technical knowledge to create a new DNA testing capability or technique that was not available at the time of trial. The mere fact that there may now be more DNA profiles available for comparison does not constitute technology in the plain and ordinary sense of the word. The district court was correct in finding that the simple availability of Hill's DNA and the general increase in DNA profiles with which to compare the unidentified DNA samples does not constitute "technology" that was not available at the time of Johnson's trial.[4] Accordingly, we affirm the district court's decision to deny "any requests in Johnson's Successive Petition seeking the comparison of previously tested but unidentified DNA samples with newly acquired profiles[.]"

    2. <u>Whether the district court erred in determining that testing on the previously untested DNA samples did not have the scientific potential to produce new, noncumulative evidence that would show it is more probable than not that Johnson is innocent.</u>

---

        **b**: a capability given by the practical application of knowledge <a car's fuel-saving *technology*>
    **2**: a manner of accomplishing a task especially using technical processes, methods, or knowledge <new *technologies* for information storage>
    **3**: the specialized aspects of a particular field of endeavor <educational *technology*>
Technology, https://www.merriam-webster.com/dictionary/technology.

[4] Although we do not rely on the legislature's statement of intent for our decision today, *Wright v. Ada Cty.*, 160 Idaho 491, 497, 376 P.3d 58, 64 (2016) ("The asserted purpose for enacting the legislation cannot modify its plain meaning." (quoting *Verska v. Saint Alphonsus Reg'l Med. Ctr.*, 151 Idaho 889, 892–93, 265 P.3d 502, 505–06 (2011))), we note that despite Johnson's argument to the contrary, the plain, usual, and ordinary definition of technology does not conflict with the legislative intent of the statute. The legislative statement of intent to Idaho Code section 19-4902 reads in part: "The purpose of this legislation is to allow for post-conviction DNA testing in appropriate cases. . . . Idaho inmates have no statutory right to tests that may exonerate them." H.B. 242, 56th Leg., 1st Reg. Sess. (Idaho 2001), https://legislature.idaho.gov/sessioninfo/2001/legislation/H0242/#sop. Thus, ostensibly, the purpose of section 19-4902 is to give Idaho inmates a statutory right to DNA testing that may exonerate them. Assigning a name to DNA samples that have already been tested and presented to a jury will not exonerate the defendant. At most, it would simply attach a name to DNA evidence that was presented at trial as belonging to an unidentified person. Such identification does nothing to lessen the evidence against the defendant because the jury already knew at the time of trial that the DNA was unidentified and chose to convict anyway. This is different than the case where no testing was performed on a DNA sample and it was unknown whether the DNA sample matched the defendant or not. In such cases, DNA testing may very well exonerate the defendant if the DNA sample can be shown to have come from the perpetrator. *See Fields v. State*, 151 Idaho 18, 22–24, 253 P.3d 692, 696–98 (2011) (holding that even though previously untested DNA samples that were taken from under the victim's fingernails did not match the defendant, the evidence did not exonerate the defendant because there was no evidence those DNA samples belonged to the attacker).

Under Idaho Code section 19-4902(e) a trial court "shall allow" DNA testing "upon a determination" that:

(1) The result of the testing has the scientific potential to produce new, noncumulative evidence that would show that it is more probable than not that the petitioner is innocent; and

(2) The testing method requested would likely produce admissible results under the Idaho rules of evidence.

I.C. § 19-4902(e)(1)–(2).

There is no dispute the second requirement, that the testing method would produce admissible results, is met. This leaves only the first requirement for our review.

After a hearing on Johnson's request for DNA testing, the district court concluded that the "possibility of identifying a third party DNA source from previously untestable samples will not make it more probable than not that Johnson is innocent . . . ." In reaching this conclusion, the district court stated:

The jury was aware that DNA that did not belong to Johnson was present at the scene of the murders . . . . Even with that knowledge, the jury convicted Johnson, deciding that Johnson either (1) fired the murder weapon herself while wearing gloves or (2) aided and abetted that actual shooter. Either theory was sufficient for a conviction. Given the fact that the possibility of a third party shooter, as evidenced by the presence of unidentified fingerprints and DNA, failed to convince the jury that Johnson was innocent of murdering her parents, the slim possibility that a name or face might now be given to that shooter adds little to the mix.

(footnote omitted).

Johnson argues that the district court erred in two respects. First, Johnson argues that the court improperly weighed the evidence at trial against the potential test results rather than simply considering the potential of the test results to prove Johnson's innocence irrespective of the trial evidence. Second, Johnson argues that the test results could identify who fired the murder weapon and that if that person was not Johnson, the DNA testing results would contradict the state's theory of the case and show that it is more probable than not that Johnson is innocent. Each contention is discussed in turn.

    a. <u>Whether under I.C. § 19-4902(e)(1), the district court properly weighed the potential DNA test results against the evidence at trial.</u>

Under section 19-4902(e)(1), the trial court is required to "make a determination that" the testing results have the "scientific potential" to "show that it is more probable than not that the

petitioner is innocent." I.C. 19-4902(e)(1). "[T]he more probable than not standard, is essentially a 51% standard." *Bourgeois v. Murphy*, 119 Idaho 611, 622, 809 P.2d 472, 483 (1991). Thus, before allowing post-conviction DNA testing, the district court must make a determination that the testing results, whatever they may be, have the scientific potential to demonstrate that it is more than fifty percent likely the petitioner is innocent.

Johnson contends that she is not required to demonstrate that the testing results "will exonerate her," and that the district court erred by weighing the potential test results against the evidence from trial. Rather, Johnson argues that "weighing the evidence is not appropriate at this juncture" and that "it is sufficient that the evidence have the 'scientific potential' to produce exonerating evidence." Johnson is partly correct—she does not have to show that the testing results *will* exonerate her. However, Johnson does have to show that the testing has the potential to produce not just exonerating evidence, but rather evidence that would make it "more probable than not that [she] is innocent." I.C. § 19-4902(e)(1). As we stated in *Fields v. State*, "test results by themselves will never show that the petitioner is not the person who committed the offense." 151 Idaho 18, 23, 253 P.3d 692, 697 (2011). Consequently, to "make a determination" about whether DNA testing has the potential to "show that it is more probable than not the petitioner is innocent," it is necessary for the district court to examine the evidence of guilt from trial and weigh whether the requested DNA testing has the potential to overcome that evidence and demonstrate that "it is more probable than not that the petitioner is innocent." I.C. § 19-4902(e)(1).

In addition to showing that the test results have the potential to "more probably than not" exonerate the petitioner, the testing results also have to produce evidence that is noncumulative. *Id.* Here, again, because the court cannot determine whether the potential DNA evidence would be cumulative without comparing it to the evidence already produced, the district court must examine the evidence produced at trial and compare it to the potential DNA testing results to determine whether the testing results can produce noncumulative evidence.

Ultimately, section 19-4902(e)(1) acts as a gateway to obtaining DNA testing. Before a court may allow post-conviction DNA testing it must make a determination of whether the requested testing has the potential to produce noncumulative DNA evidence that would make it more probable than not that the petitioner is *innocent*. This necessitates a weighing of the evidence at trial against the potential testing results. Accordingly, we hold that section 19-

4902(e)(1) requires the district court to weigh the potential testing results against the evidence from trial to determine: (1) whether it is more probable than not the test results may exonerate the petitioner, and (2) whether the testing results would produce new, noncumulative evidence.

b. <u>Whether the district court erred in concluding that the DNA evidence that was not tested at the time of trial but may now be tested using advanced DNA technology did not have the potential to show that it was more probable than not that Johnson was innocent.</u>

In ruling on Johnson's motion, the district court concluded:

Further testing might reveal the source of DNA samples found on Johnson's robe, on the gun and elsewhere, but that knowledge does nothing to establish that the source of those samples was present in the Johnson's home on the morning of the crime, that the source of those samples was the shooter, or that Johnson didn't aid and abet the murderer of her parents. Consequently, because an analysis of previously untestable DNA samples will not make it more probable than not that Johnson is innocent, her request for DNA testing will not be granted.

Johnson argues the DNA testing does, in fact, have the potential to identify the shooter. And, if the shooter is not Johnson, her argument continues, then "the DNA evidence would show that she is innocent of first degree murder." Johnson premises this argument on the theory that because Johnson was given a deadly weapon enhancement the jury must have found that Johnson was the shooter and not an accomplice or aider and abettor.

At the outset, we note that Johnson is correct. An aider and abettor cannot be given a sentence enhancement under Idaho Code section 19-2520. *State v. Sivak*, 105 Idaho 900, 908, 674 P.2d 396, 404 (1983) ("The statute cannot be used to convict a person who was merely an aider or abettor."). Rather, the sentencing enhancement can only be applied where the defendant had "actual physical possession of guns during the commission of [the crime]." *State v. Thompson*, 101 Idaho 430, 438, 614 P.2d 970, 978 (1980). Moreover, during sentencing, the trial court explicitly stated: "The jury found you [Johnson] were the shooter." As a result, any DNA evidence that shows Johnson was not the shooter would militate against the jury's verdict.

However, as explained above, post-conviction DNA testing under section 19-4902 is not allowed for *any* potentially exonerating DNA evidence. Testing is only allowed in circumstances where the DNA evidence has the potential to "show that it is more probable than not that the petitioner is innocent." I.C. § 19-4902(e)(1). Such a determination requires weighing the evidence at trial against the potential DNA evidence. *Supra*, Part 2.a.

10

According to Dr. Greg Hampikian, the potential DNA evidence that was not tested at the time of trial but may now be tested using advanced DNA technology is as follows:

11. In particular, no conclusions could be reached due to insufficient amounts of DNA concerning the bloodstain 24 from the robe, the tissue from the lower left side of the robe, the tissue from the inside lower back of the robe, the tissue from the inside left sleeve of the robe, the stain from Bruno Santos' pants, the fibers imbedded in unknown material, bloodstain B from the rifle, and bloodstain G from the rifle. This evidence may now be tested using advanced DNA amplification, purification, and analysis techniques.

12. Robe samples #24-30 were never analyzed and may now be tested using advanced DNA amplification, purification, and analysis techniques.[5]

13. DNA from the unidentified fingerprint on the .264 round (Item # 14) could not have been tested at the time of trial, but may now be tested using advanced DNA amplification, purification, and analysis techniques.

14. DNA from the unidentified fingerprints on the doorknob set on Diane and Alan Johnson's bedroom door (Items # 15-16) could not have been tested at the time of trial, but now may be tested using advanced techniques not available at the time of trial and compared to reference samples from the time of trial and after and submitted to a CODIS databank.

15. DNA from the palm prints (Items 20-2 and 20-3) could not have been tested at the time of trial, but may now be tested using advanced DNA amplification, purification, and analysis techniques.

16. DNA from the print on the empty shell casing (Item 12-1) could not have been tested at the time of trial, but now may be tested using advanced DNA amplification, purification, and analysis techniques.

17. One of the hairs removed from Bruno Santo's [sic] sweater has a small root and could now be analyzed using advanced DNA amplification, purification, and analysis techniques.

18. DNA from an unknown contributor found on the inside of the latex glove can now be further analyzed using advanced DNA amplification, purification, and analysis techniques.

18. [19.] Low levels of DNA from an unidentified source were found on the leather glove from the garbage can. That DNA can now be analyzed using advanced DNA amplification, purification and analysis techniques.

---

[5] After examining the record, it is apparent that robe samples 24 and 25 were examined. The testimony was that bloodstain 24 on the robe was too small to get a complete profile. However, the predominate profile from bloodstain 25 on the robe matched Diane's profile. Robe samples 26–30 were explicitly reserved for DNA testing in the event the defense chose to request testing for trial. The defense did not request the testing. Thus, out of stains 24–30, only bloodstain 24, as a sample that could not be tested at the time of trial due to the lack of proper technology, would be available for post-conviction testing under section 19-4902.

After examining the record, there is nothing to establish that any of these DNA samples came from the shooter. There is no DNA or fingerprint evidence on the trigger, trigger guard, or bolt lever of the gun. Additionally, testimony at trial was clear that there is no way to determine when any of the fingerprint or DNA samples on the gun, the shell casings, the robe, the latex glove, or the leather glove were deposited on the items.[6] Thus, even if we view the potential outcome of the requested testing in the light most favorable to Johnson and assume that some or even all of these samples came from a single third-party source, it would—at best—show that at some unidentified point in time, and in some unidentified manner, such person was close enough to those items to leave their DNA on them. But, because there is no way to tell when the DNA was deposited on the items, the evidence cannot show that such person used the gun, gloves, ammunition, or robe on the day of the murder. Therefore, the evidence has no potential to show, and again, even assuming that all these samples came from the same person, that such person was the shooter. Likewise, the evidence cannot show that Johnson was not the shooter. At best, the evidence would provide some additional evidence from which the jury might infer that someone else besides Johnson was involved. However, the jury was already informed of the possible involvement of a third-party due to the presence of DNA samples and fingerprints that were tested at the time of trial and returned unknown. For example, at trial, the jury was aware of

---

[6] For example, Amber Moss, a forensic DNA analyst, testified about the blood stains:

> **Q:** Let's talk about that for a minute. Do you have any way to age when a sample was placed on an item?
> **A: No. DNA cannot indicate the time that the stain was placed on an item.**
> **Q:** Okay, and so there's no way to determine whether or not this stain was put on [the gun] 10 years before, 20 years before, or that day, is that correct?
> **A: No. In fact, if it was stored properly, it could have been 10 years ago. DNA doesn't tell. It can't discriminate between old stains and new stains.**

Testimony from Cynthia Hall, a DNA forensic scientist, revealed the following about DNA samples generally:

> Q: How about DNA? Are you able to age it? Do you know when it was placed on a surface?
> **A: No, I do not.**
> Q: And why is that?
> **A: There is no method of testing to determine how old a DNA sample is. I can determine whether or not DNA is present, and whether or not I'm able to obtain a profile, but I cannot say how old that sample is.**

Tina Walthall, a fingerprint forensic scientist, gave similar testimony about fingerprints:

> Q: Is there any wat to determine, just looking at a fingerprint, how old it is?
> **A: No, there is no way.**
> Q: Okay, so all of the fingerprints that you identified as latent prints in this case, you can't say whether they're a day old or whether they're ten years old, is that correct?
> **A: That is correct.**

unidentified fingerprints on the scope, gun, some of the shells, and the box containing shells.[7] The jury was also aware of unidentified DNA samples from the bathrobe. The defense used these unidentified samples and fingerprints to present the theory that a third-party was involved, but the jury still chose to convict Johnson. Adding a few more pieces of evidence that a third-party was present at the time of the murders is unlikely to produce an acquittal. Furthermore, the results do nothing to lessen the evidence produced at trial that implicated Johnson. And that evidence was substantial.

Some of that evidence included the following: Johnson was angry with her parents because they were going to report her boyfriend, a nineteen-year-old illegal immigrant, to the police on the day they were murdered. Johnson gave at least five different accounts about the events of the morning of the murders. Differences in those accounts included whether she was asleep or awake then the first shot was fired, whether she was in her room or outside her parents' room when the second shot was fired, and whether her parents' bedroom door was open or closed. Expert testimony was that the parents' and Johnson's bedroom doors were open. Johnson's bedroom door and her parents' bedroom door are parallel to each other in the hallway. Yet, in at least one account, Johnson testified that aside from the two gunshots, she did not hear or see any sign of a struggle in her parents' bedroom. Police found a leather glove from Diane's SUV in Johnson's room and the matching glove wrapped in a bloody bathrobe in a garbage can that was placed out for collection. A latex glove was also found in the garbage can. The bathrobe, the leather glove, and the latex glove all had Johnson's DNA on them. The bathrobe, which belonged to Johnson, had paint chips on it that matched the paint on the shirt Johnson was wearing on the morning of the murders. Testimony indicated that Johnson's path out of the house took her past the garbage can. There was testimony that the garbage was supposed to be collected the morning of the murders and that Johnson became upset when she learned the garbage collection had been halted. Police observed footprints in the dew on the lawn going to and from the Johnson home and the guesthouse. The murder weapon, a .264 rifle, was kept in the guest house, Johnson knew the gun was there and she was known to have been in the guesthouse on the days immediately preceding the murders. A guesthouse key, along with unspent .264

---

[7] These were later identified as belonging to Christopher Hill. *Johnson II*, 156 Idaho 7, 10, 319 P.3d 491, 494 (2014). Hill helped Speegle move into the guesthouse in 2002. *Id.* In explaining why his prints would be on the gun and ammunition box, Hill testified that in 2001, when he was a caretaker at Speegle's ranch, he "took [the rifle] out, tried to sight it," and shot it "six or seven times." *Id.*

caliber shells, one of which had Diane's tissue matter on it, were found in Johnson's room on the morning of the murders. Finally, when Johnson was examined on the day of the murder she had linear bruises on her left shoulder that were approximately between two and four inches long and were consistent with a recent impact, such as gun recoil.

Johnson goes to great lengths to point out how the district court erred in its assessment of the evidence from trial; however, nothing in her attack on the district court's assessment establishes that the untested DNA samples came from the shooter. Without evidence establishing that the DNA samples came from the shooter, we cannot say—especially when compared to the substantial amount of evidence from trial that implicates Johnson—that the district court erred in determining the testing results do not have the potential to demonstrate that it is more probable than not Johnson is innocent. *See Fields v. State*, 151 Idaho 18, 24, 253 P.3d 692, 698 (2011) (holding that without evidence to show that previously untested DNA samples came from the perpetrator of the crime, speculation about who the DNA samples came from or how they got there would not show that the petitioner was innocent).[8]

**B. Whether the Eighth Amendment, under *Miller* and *Montgomery*, provides Johnson relief from her two fixed life sentences.**

Johnson argues that her fixed life sentences constitute cruel and unusual punishment in violation of the Eighth Amendment and that under *Miller v. Alabama*, 132 S. Ct. 2455 (2012) (outlawing mandatory life for juveniles and requiring courts to consider youth and its attendant circumstances before sentencing a minor to fixed life without parole), and *Montgomery v. Louisiana*, 136 S. Ct. 718, 734 (2016) (holding that *Miller* is retroactive and binding on the States), her sentence is illegal. The district court dismissed this claim under Idaho Code sections 19-4901(b) and 19-4908. The district court also found that even if the claim was not barred by sections 19-4901(b) and 19-4908, the sentence did not violate the Eighth Amendment because the trial court, as required by *Miller*, properly considered Johnson's youth in its sentencing.

---

[8] Johnson argues that because testing was allowed in *Fields* testing should be allowed in this case as well. However, this argument overlooks that fact that the district court in *Fields* had already allowed the testing when the case reached this Court. This Court was not asked to determine whether testing was appropriate and did not hold that the testing was properly allowed. It simply held that the test results from the already completed testing, could not support a finding that Fields was innocent. *Fields*, 151 Idaho at 24, 253 P.3d at 698. That holding was premised on the fact that there was no evidence establishing that the DNA matter that was tested came from the murderer. *Id.* Without such evidence, this Court held that the results could not establish Fields's innocence. *Id.* Such reasoning also would support a finding that the testing did not need to be allowed in the first place. Without evidence that the DNA material to be tested came from the attacker, the testing results had little to no potential to prove Fields's innocence and, therefore, the district court could have denied testing in the first instance. Consequently, the fact that the district court allowed testing in *Fields* does nothing to support a claim that testing should be allowed here.

14

1. <u>Whether section 19-4901(b) or section 19-4908 bar Johnson's claim.</u>

Post-conviction "is not a substitute for . . . an appeal from the sentence or conviction." I.C. § 19-4901(b); *accord Rogers v. State*, 129 Idaho 720, 725, 923 P.2d 348, 353 (1997). "Any issue which could have been raised on direct appeal, but was not, is forfeited and may not be considered in post-conviction proceedings." I.C. § 19-4901(b). However, "[p]ost-conviction relief proceedings are designed to permit a challenge to an underlying conviction or to an *illegal* sentence." *Brandt v. State*, 118 Idaho 350, 352, 796 P.2d 1023, 1025 (1990); *accord Hollon v. State*, 132 Idaho 573, 580, 976 P.2d 927, 934 (1999).

The district court found that Johnson could have brought her Eighth Amendment claim in her direct appeal and because the claim did not raise a substantial doubt about the reliability of the finding of guilt it was barred by section 19-4901(b). The district court's ruling was incorrect.

Although Johnson could have brought a claim in her direct appeal arguing that her sentence was cruel, unusual, or excessive, *see, e.g.*, *Hollon*, 132 Idaho at 581, 976 P.2d at 935, she could not have argued that her sentence was *illegal* under *Miller*'s interpretation of the Eighth Amendment until after *Miller* was decided. *Miller* was decided in 2012. Johnson's direct appeal was decided in 2008. Thus, she could not have brought her claim that her sentence was illegal in her direct appeal because *Miller* was decided after her direct appeal was decided. Consequently, the district court erred in dismissing the claim under section 19-4901(b).

This is also true of the district court's dismissal under section 19-4908, which states that any grounds for post-conviction relief not raised in an original petition are permanently waived absent "sufficient reason" for failure to do so. I.C. § 19-4908. An analysis of "sufficient reason" "must necessarily include an analysis of whether the claims being made were asserted within a reasonable period of time." *Charboneau v. State*, 144 Idaho 900, 905, 174 P.3d 870, 875 (2007). We determine what constitutes a reasonable period of time on a case-by-case basis. *Id.*

Here again, the district court found that Johnson could have made an Eighth Amendment claim in her original post-conviction petition but did not and therefore her claim was barred. While it's true Johnson could have made *an* Eighth Amendment claim that her sentence was generally excessive or cruel or unusual, she could not have made the claim that her sentence was *illegal* under *Miller*'s holding interpreting the Eighth Amendment until after *Miller* was decided. The State, however, argues that even if that is true, Johnson did not bring her *Miller* claim until

15

approximately a year and a half after *Miller* was decided. A year and half, the State argues, is not a reasonable amount of time to wait to bring a claim.

We make two observations on this point. First, we note that the district court ruled that the Amended Successive Petition was filed *nunc pro tunc* to April 9, 2012. Thus, the Amended Successive Petition has the legal effect of being filed on that date. *Miller* was argued in March and decided in June 2012, thereby placing the legal filing of Johnson's Amended Successive Petition squarely within the *Miller* timeframe. Second, we note that the recent decision in *Montgomery* made the holding in *Miller* retroactive and binding on the States. *Montgomery*, 136 S. Ct. at 732. Consequently, even if we decline to address the issue today, Johnson would be free to file a new petition and bring the claim anew. Given these unique circumstances surrounding this claim, we hold that in this particular case, Johnson's Eighth Amendment claim was brought within a reasonable time. *Charboneau*, 144 Idaho at 905, 174 P.3d at 875 (noting that we will decided what a reasonable time is on a case-by-case basis). We will decide the issue on the merits.

  2. Whether *Miller* and *Montgomery* provide Johnson relief.

*Miller* held that the Eighth Amendment forbids sentencing schemes that require mandatory life in prison without possibility of parole for juvenile offenders. 132 S. Ct. at 2469. The Court then went on to state that while sentencing courts may still impose life in prison without possibility of parole for juvenile offenders in homicide cases, the sentencing court must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.*

*Montgomery* made the holding in *Miller* retroactive and binding on the states. 136 S. Ct. at 734 ("*Miller* announced a substantive rule of constitutional law. Like other substantive rules, *Miller* is retroactive . . . ."). *Montgomery* was careful, however, to note that "*Miller* did not require trial courts to make a finding of fact regarding a child's incorrigibility." *Id.* at 735. Indeed the Court specifically stated: "[W]e leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Id.* (quoting *Ford v. Wainwright*, 477 U.S. 399, 416–17 (1986) (alterations in original)). That being said, *Montgomery* also made it clear that "*Miller* requires a sentencer to consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence." *Id.* at 734.

16

Johnson argues because the district court sentenced her "without adequate consideration of mitigation arguments based on youth and without a finding that she was irreparably corrupt," her sentence violated the Eighth Amendment. As to the latter part of her argument, that the court erred because it did not specifically find that Johnson was "irreparably corrupt," that argument is without merit. *Id.* at 735 ("*Miller* did not impose a formal factfinding requirement . . . ."). *Miller* and *Montgomery*, do, however, require that the sentencing court weighs the juvenile offender's youth and characteristics against the nature of the crime to determine whether the crime was one that "reflected the transient immaturity" of youth. *Id.* The requirement to hold such a hearing "gives effect to *Miller*'s substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity." *Id.*

Here, the trial court held just such a hearing. Drs. Craig Beaver and Richard Worst testified at the sentencing hearing about the developmental state of an adolescent's brain compared to an adult and how youth are more prone to impulsivity and more likely to be able to be rehabilitated.[9] Indeed, Johnson herself spends approximately two pages in her Amended Successive Petition highlighting the evidence presented about her youth. Following the testimony about Johnson's youth and the possible effects that it would have on her decision-making ability and her propensity for rehabilitation, the trial court spent considerable time discussing the reasons why it was imposing life without parole and explicitly noted that it had heard and considered the evidence presented on Johnson's youth. The trial court's sentencing colloquy was approximately forty-four pages and makes specific reference to having considered the testimony about Johnson's youth, including: "I also want to say to everyone here that I have heard what you have said. I have listened attentively"; "I would also say to you that it's important to me, in this analysis, to consider the totality of all the facts and circumstances, and not any one piece in isolation"; "[ ] I recognize that some of the psychological evidence presented here at this sentencing hearing was to the effect that adolescents can act impulsively . . . ."; "[ ] on the mitigating side, there is in fact your age"; "[ ] I don't think it's a product of your age." Although *Miller* and *Montgomery* had not been decided at the time of the sentencing hearing, and therefore the terms of "irreparably corrupt" and "transient immaturity" where not in the court's lexicon at that time, the court clearly considered Johnson's youth and all its attendant characteristics and determined, in light of the heinous nature of the crime, that Johnson, despite

---

[9] Dr. Beaver's testimony was approximately forty pages. Dr. Worst's testimony was approximately sixty-eight pages.

her youth, deserved life without parole. Accordingly, we affirm the district court's ruling that Johnson's Eighth Amendment claims under *Miller* fail.

**C. Whether *Murphy* should be overruled.**

Claims 2–5 of Johnson's Amended Successive Petition alleged ineffective assistance of her original post-conviction counsel because original post-conviction counsel did not properly assert ineffective assistance of counsel claims regarding trial counsel. The district court dismissed those claims on the grounds that Johnson had conceded that *Murphy v. State*, 156 Idaho 389, 327 P.3d 365 (2014), precluded her from bringing those claims. *Murphy* held that claims of ineffective assistance of post-conviction counsel are not a "sufficient reason" under Idaho Code section 19-4908 for allowing a successive petition. *Id.* at 395, 327 P.3d at 371.

On appeal, Johnson contends that *Murphy* should be overruled and claims 2–5 of her Amended Successive Petition should be remanded to the district court. The State responds that the Court should not consider Johnson's argument because: (1) Johnson's claims were untimely; (2) the dismissal of her claims was invited; and (3) Johnson has failed to demonstrate that *Murphy* was manifestly wrong, unwise or unjust. We address each argument in turn.

1. Whether claims 2–5 in Johnson's successive petition were untimely.

A post-conviction proceeding is commenced by filing a petition "any time within one (1) year from the expiration of the time for appeal or from the determination of an appeal or from the determination of proceedings following an appeal, whichever is later." I.C § 19-4902(a).

The appeal from Johnson's original post-conviction proceeding was decided on February 18, 2014. *Johnson II*, 156 Idaho at 7, 319 P.3d at 491. The original post-conviction proceeding is a "proceeding following an appeal." Therefore, the one-year time limit under section 19-4902(a) did not begin to run until February 18, 2014. Johnson filed her successive petition on April 9, 2012.[10] Consequently, Johnson's successive petition, which was filed before the one-year time limit even began to run, was timely. The State's argument to the contrary is simply unavailing.

2. Whether Johnson should be barred from arguing that *Murphy* should be overruled because she did not argue the issue in the district court.

The State argues that Johnson should be barred from arguing that *Murphy* should be overruled because Johnson conceded that her claims were barred by *Murphy* and indicated that she would bypass the state courts and proceed with those claims in federal court.

---

[10] Later amended on January 22, 2014, but ruled as being filed *nunc pro tunc* to April 9, 2012.

In her Objection to Respondent's Motion for Summary Dismissal, Johnson's counsel stated:

> *Murphy* now appears to present a bar to [claims 2–5]. Accordingly, [Johnson] will file a Petition for a Writ of Habeas Corpus raising the ineffective assistance of counsel claims . . . . Now that *Palmer* has been overruled by *Murphy*, *Martinez* permits [Johnson] to raise the ineffective assistance of counsel claims in this petition directly in federal court and bypass the state courts entirely.

This constitutes a clear concession that claims 2–5 are barred by *Murphy*. Further, Johnson's counsel's statement that Johnson "will file a Petition for a Writ of Habeas Corpus raising the ineffective assistance of counsel claims" and "bypass the state courts entirely" without presenting any argument as to why the claims should be allowed in state court, constitutes a withdrawal of the issue. This conclusion is further buttressed by Johnson's counsel's statement at the hearing: "[W]e concede that, following the *Murphy* decision of our Supreme Court, there are certain claims that have been obviated. As [counsel] has pointed out, that matter can be taken up in federal habeas proceedings."

While Johnson's statements are not sufficient to find that she invited the district court to dismiss the claims, they do clearly indicate an intention to abandon those claims in state court and pursue them in federal court.[11] Because Johnson withdrew these claims from the district court's consideration and provided no argument as to why the claims should be allowed despite our ruling in *Murphy*, we need not address the issue. *E.g.*, *State v. Phillips*, 123 Idaho 178, 182, 845 P.2d 1211, 1215 (1993) ("[C]ounsel for appellant withdrew this issue . . . . Therefore, we decline to address it."). However, given that both parties have fully briefed the issue, including authority and arguments, and considering that Johnson has already filed her habeas petition in federal court, we will address the issue to provide future guidance. *See cf. Comer v. Cty. of Twin Falls*, 130 Idaho 433, 436, 942 P.2d 557, 560 (1997) (noting that the rule that issues not listed as issues on appeal can be relaxed when both parties "fully brief th[e] issue, including authority and arguments"); *Johnson v. Bonner Cty. Sch. Dist. No. 82*, 126 Idaho 490, 493, 887 P.2d 35, 38 (1994) (deciding to address a moot issue to provide future guidance and direction).

3. <u>Whether *Murphy* should be overruled.</u>

"*Stare decisis* requires that this Court follows controlling precedent unless that precedent is manifestly wrong, has proven over time to be unjust or unwise, or overruling that precedent is

---

[11] Johnson has filed such a petition and it is currently stayed, pending resolution of this appeal. *Johnson v. Kirkman*, No. 4:14-CV-00395-CWD, 2014 WL 7186842, at *1 (D. Idaho Dec. 16, 2014).

necessary to vindicate plain, obvious principles of law and remedy continued justice." *State v. Owens*, 158 Idaho 1, 4–5, 343 P.3d 30, 33–34 (2015).

Johnson argues that in light of *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), this Court's holding in *Murphy* should be overturned.[12] In *Murphy*, we held that claims of ineffective assistance of post-conviction counsel "cannot demonstrate 'sufficient reason' for filing a successive petition," 156 Idaho at 395, 327 P.3d at 371. In reaching this holding, we relied on the U.S. Supreme Court's ruling in *Coleman v. Thompson*, which held that "[t]here is no constitutional right to an attorney in state post-conviction proceedings" and therefore "a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." 501 U.S. 722, 752 (1991).

In *Martinez*, the U.S. Supreme Court announced a "narrow exception" to *Coleman*:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

132 S. Ct. at 1320. In *Trevino v. Thaler*, the Court extended its holding in *Martinez* to include states where the "procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal."[13] 133 S. Ct. 1911, 1921 (2013). Thus, *Martinez* applies in Idaho. *See Matthews v. State*, 122 Idaho 801, 806, 839 P.2d 1215, 1220 (1992) (recognizing that the post-conviction setting is the "preferred forum for bringing claims of ineffective assistance of counsel," though in limited instances such claims may be brought on direct appeal "on purported errors that arose during the trial, as shown on the record"); *see also Nielson v. Yordy*, No. 1:14-CV-00236-EJL, 2016 WL 427062, at *11–15 (D. Idaho Feb. 3, 2016) (ruling that *Martinez*, as defined in *Trevino*, applies in Idaho).

However, while *Martinez* made it obligatory for federal habeas courts to hear claims of ineffective assistance of trial counsel if initial post-conviction counsel was not provided or failed

---

[12] Johnson also argues *Murphy* should be overturned because the Court erroneously interpreted the phrase "sufficient reason" to require a showing of a constitutional violation. This argument misconstrues *Murphy*. *Murphy* did not interpret the phrase "sufficient reason," rather it simply held that because there is no right to post-conviction counsel a claim of ineffective assistance of post-conviction counsel necessarily fails and therefore such a claim can provide no reason, let alone a sufficient one, to allow a successive petition. 156 Idaho at 394–95, 327 P.3d at 370–71.

[13] In *Nguyen v. Curry*, 736 F.3d 1287, 1293 (9th Cir. 2013), the Ninth Circuit extended *Martinez* even further, holding that it can also apply to underlying claims of ineffective assistance of appellate counsel.

20

to properly raise those issues, *Martinez* is explicitly equitable in nature. *Martinez*, 132 S. Ct. at 1319–20. Because the holding in *Martinez* is not a constitutional holding it is not binding on state courts. *Id.* at 1320 ("In addition, state collateral cases on direct review from state courts are unaffected by the ruling in this case."). Accordingly, we are not obligated to follow *Martinez* in our state courts. And we choose not to. The underlying policy in *Murphy* has not changed in the two years since it was decided, and we decline to apply *Martinez* in our state courts. *Murphy* remains good law. *Martinez* simply means such claims will not be procedurally defaulted in federal habeas proceedings and the federal court will have to address those claims on the merits.[14] The district court's dismissal of counts 2–5 in Johnson's Amended Successive Petition is affirmed.

## IV. CONCLUSION

We affirm the district court's rulings regarding DNA testing under section 19-4902. We recognize the holdings in *Miller* and *Montgomery* apply to Idaho, but affirm the district court's ruling that the substantive requirement in those cases—that the sentencing court holds a hearing that considers the youth of the offender—was met. We further recognize the U.S. Supreme Court's holding in *Martinez*, but decline to apply *Martinez* in Idaho state law and thus affirm the district court's dismissal of claims 2–5 of Johnson's Amended Successive Petition.

Justices EISMANN, JONES, HORTON and BRODY, **CONCUR.**

---

[14] *Kirkman*, 2014 WL 7186842, at *2 n.1. (noting that due to *Murphy* and *Martinez*, such claims will not be procedural defaulted and the federal courts will be required to address the claims on the merits).

21